## NATIONAL LABOR RELATIONS BOARD v. EATON MFG. CO., WILCOX–RICH DIVISION.

### No. 10654.

United States Court of Appeals Sixth Circuit.

June 16, 1949.

Marcel Mallet–Prevost, Washington, D. C. (David P. Findling, A. Norman Somers, Marcel Mallet–Prevost, Washington, D. C., and Samuel M. Kaynard, on the brief), for petitioner.

Richard Inglis, Jr., Cleveland, Ohio (Hauxhurst, Inglis, Sharp & Cull, Frank X. Cull, Cleveland, Ohio, Crane, Crane & Kessel, Lloyd T. Crane, Saginaw, Mich., on the brief), for respondent.

Padway, Goldberg & Previant, Milwaukee, Wis., amicus curiae, for International Union, U. A. W. of Am. A. F. of L. and Local No. 433.

Before SIMONS, ALLEN and MARTIN, Circuit Judges.

ALLEN, Circuit Judge.

The principal question presented by this petition for enforcement is whether an employer, not hostile to unions, who renews a maintenance of membership contract with a union then the bargaining representative, with knowledge that the union is pressing for the discharge of employees who have endeavored to bring in another union as bargaining representative, and later discharges employees in accordance with the terms of the closed-shop contract, because of their expulsion in

regular order by the union, is guilty of an unfair labor practice. The Board held that the respondent had violated § 8(1) and § 8(3) of the National Labor Relations Act, 29 U.S.C., § 158(1) and § 158 (3), 29 U.S.C.A. § 158(1, 3), and ordered the reinstatement of John Boyd, Murvin Stoner, Lenore Harris, and Francis Harvey, who had been discharged under the closed-shop contract because they had ceased to be members in good standing of the union.

The case arises out of the following facts:

The respondent makes automotive engine parts, and operates plants in several states, the two here involved being located in Saginaw, Michigan. In its various plants respondent deals with all the principal metal-working unions, the C. I. O., the M. E. S. A., and the A. F. L. At the Saginaw plants the C. I. O., without any opposition from respondent, organized the plants in 1937. In 1939 the Local C. I. O. president, Homer Martin, led the organization to the A. F. L. In late 1940 a jurisdictional dispute arose between the A. F. L. and C. I. O., in the course of which the Saginaw plants were picketed by C. I. O. sympathizers, and violence and rioting occurred, with consequent injury to numerous persons. After the strike was over respondent desired to return all of the strikers to work, but the A. F. L. union would not permit this. Respondent sent out notices and telegrams, recalling all former employees, but they were compelled to receive approval of the A. F. L. union before re-employment, and some 85 of the 300 strikers were not returned to work. The A. F. L. remained bargaining agent without opposition from January, 1941, until April, 1946, under written contracts in force for two-year periods. The contract effective May 16, 1944, contained a closed-shop provision. On April 6, 1946, the C. I. O. demanded bargaining rights, and filed a petition for certification as bargaining representative. On April 17 the C. I. O. filed with the Board charges that respondent had called employees into the front office in order to discourage them from joining the C. I. O., and had threatened to discharge employees for joining the C. I.

O. At the trial before the examiner, the C. I. O. international representative stated that he knew that the filing of the unfair labor charges would delay an election. The Board found the charges to be "groundless" and held that by filing them the C. I. O. had prevented a prompt determination of the representation question.

On April 17, 1946, the A. F. L. union began to press respondent with demands, written and oral, that Boyd, former president of the A. F. L. Local, and Knapp, at whose house on April 7, 1946, a C. I. O. meeting was held, be suspended. Grievances were also filed against Stoner, Harris and Harvey, who had been active in procuring C. I. O. signers. On inquiry by respondent as to the nature of the charges against its employees, the A. F. L. refused to detail the reasons underlying their demands, on the ground that the matters were union business. Boyd, Knapp and Stoner secured a temporary injunction against respondent and the A. F. L. in the Michigan Circuit Court, on the ground that they were about to be illegally expelled from membership in the A. F. L. On April 30 the preliminary injunction was dissolved as to respondent and modified as to the A. F. L., to provide that the A. F. L. should not interfere with the status of the plaintiffs as members of its organization except in accord with the provisions of the constitution of the international union U. A. W.-A. F. L.

The A. F. L. informed respondent that there would be no work after May 15 without a new contract, and on May 13 it was agreed between respondent and the union that the contract should be renewed without change for the usual two-year period. A proviso was added that as to the Saginaw plants the contract should be from day to day only, and subject to the determination of the Board pending the petition for election and disposition of the unfair labor practice charges. Meanwhile the grievance committee of the A. F. L. had been pressing charges against Boyd, Knapp, Stoner, Harris and Harvey, and demanding that the respondent discharge them on the ground that they were not union members in good standing. All of these employees were charged with viola-

tion of union rules and constitution, in accordance with Art. 32, § 4, of the constitution of the international union U. A. W.-A. F. L., which includes, among other provisions not pertinent here, as the basis of charges, the following:

"(a) Violation of a specific provision of the Constitution.

"(b) Violation of the oath of loyalty to the Local and the International.

"(c) Violation of the oath of office.

"(d) Gross disloyalty or conduct unbecoming a member.

\* \* \* \* \* \*

"(g) Secession, or fostering the same.

"(h) Abuse of fellow members or officers by written or oral communication.

"(i) Abuse of fellow members or officers in the meeting hall.

"(j) Activities which tend to bring the Local or International into disrepute.

"(k) Disobedience to the rules, regulations, mandates, and decrees of the Local or of the officers of the International.

"(l) Destruction, alteration, mutilation of Union books, bills, receipts, vouchers or other property.

"(m) Such other acts and conduct which are inconsistent with the duties and obligations of a member of a Labor Union, and for violation of sound Labor Union principles."

It is to be observed that the above list of charges includes many offenses in no way protected by the National Labor Relations Act.

On May 6 a union trial committee of seven members heard the charges against Boyd and Knapp. Knapp, who was charged with making false and slanderous statements concerning the union and its officials and causing dissension, was found not guilty, and is still employed at respondent's plant. Boyd was found guilty by a vote of five to two, which was later ratified by the great majority of the union members.

Boyd had been employed by respondent for some 14 years, including his re-employment upon his return from service in the Carribbean with the United States Navy. He had previously been president of the A. F. L. Local, and in 1940 was very hard on the C. I. O. adherents. He ran for president of the A. F. L. Local in late 1940, and was roundly beaten. He at once instituted a course of abusive conduct calculated to arouse enmity in the union. He himself stated at the hearing herein that he had been making complaints all along through and after November, 1940, and to the question, "You had been complaining all the time?" he answered as follows: "Sending men up on complaints and telling them to jump the Bargaining Committee on this or that.

"Q. That was part of the tactics you had worked out to embarrass the Bargaining Committee? A. Yes. CIO.

"Q. That was the way you were helping the CIO? A. Yes.

"Q. You criticized the job evaluation worked out by the committee and the Company? A. I did.

"Q. You referred to the Bargaining Committee as being stooges for the Company? A. Yes. I told them they were a bunch of Company men."

Boyd was suspended for thirty days in January, 1946, by the respondent, for drunk and disorderly conduct. He was charged with being drunk in the plant, violating plant rules, and using obscene language toward a woman steward. Boyd in effect admitted the charge of drunkenness, saying, "I had a drink." To the question, "You had so many you can not remember?" he finally answered, "Yes, I might have had or I might have had a couple." He admitted going into the hydraulic department where a woman steward worked and having an argument with her. Another employee testified to Boyd's use of obscene language in a union meeting. At the union trial he was found guilty of abuse of fellow-members or officers by written or oral communication and suspended for 99 years. Thus Boyd was tried on a charge covered by union rules, tried in accordance with those rules, and found guilty upon substantial evidence.

Similar demands for discharge were made by the A. F. L. as to Stoner, Harris and Harvey. These three employees did not have trials before a union trial committee. They were expelled from the local union by the president of the inter-

national union, in accordance with the international constitution. This document gives the international president the right summarily to expel or suspend a member of a local union, subject to the right of appeal to the international executive board before which such employees are entitled to a trial. The removal letter sent by the international president to Harvey, Harris and Stoner, charged each of them with violation of oath, conduct unbecoming union members, fostering secession, causing unrest and dissension, and provoking and inciting work stoppages. No appeal was taken from the action of the international president, and the expulsion was in strict compliance with the constitution of the union. All three employees were charged with slandering the bargaining committee, calling them stooges, and making derogatory remarks about them. In addition, Stoner was charged with stealing a seniority list of the A. F. L., Harris with trying to organize a sit-down strike, and Harvey with being drunk at union meetings. When counsel for respondent was shown the union constitution and the letters of the international president expelling Stoner, Harris and Harvey, he determined that the three employees had been discharged in accordance with the union constitution and procedure, and recommended their discharge, which followed.

On May 16, 1946 the A F. L. again demanded the discharge of Boyd, and refused time for respondent to consult counsel on the matter. A sit-down strike was started at the plant. Counsel for respondent came immediately to the plant, conferred with the union representatives, concluded that Boyd's discharge had been strictly in accord with the A. F. L. constitution, and advised his removal on the ground that he was no longer a member in good standing of the union. Boyd was removed, and work was immediately resumed at the plant.

The complaint alleged no discrimination by respondent during this period as to hire, tenure, or terms of employment, nor did it make specific charges of such discrimination. It charged that respondent's labor director, Richards, in 1940 warned respondent's employees to beware of the C.

I. O. organizational efforts, and also offered the employees money to engage an attorney to resist the C. I. O. At the time of hearing Richards was dead. The trial examiner found that the record did not justify a finding of interference and coercion on this point, and recommended that the allegation be dismissed.

A like recommendation was made by the trial examiner as to an allegation that in December, 1940, and January, 1941, respondent's agents required its employees on re-employment to sign written agreements not to strike. The trial examiner, who made a careful and accurate review of the voluminous evidence concluded that while the returning strikers were cautioned not to engage in quarrels, arguments, or wandering about the plant, they were not asked to sign a pledge not to strike. He therefore recommended the dismissal of this allegation. The Board sustained the trial examiner's recommendations that the allegations should be dismissed. Also the Board held that because of the C. I. O's filing an unfair labor practice charge which was groundless, thus preventing a prompt determination of the representation question, respondent had not violated the Act by executing the 1946 agreement with the A. F. L. while the C. I. O.'s representation petition was pending before the Board, undetermined. Hence the Board sustained respondent's position with reference to all the charges except those growing out of the execution of the closed-shop contract of 1946 and its enforcement through the discharges described above. Both the trial examiner and the Board considered that these transactions constituted a violation of the Act, in view of the holding of the Supreme Court in Wallace Corp. v. National Labor Relations Board, 323 U.S. 248, 65 S.Ct. 238, 89 L.Ed. 216.

We do not detail the evidence set forth carefully by the trial examiner on the question whether respondent knew that the hostility arising from the C. I. O. organizing drive of 1945–6 was the main cause of these expulsions. Apart from the fact that respondent candidly admitted suspecting the existence of this factor, we think that respondent was bound to be aware of its possible existence after the active juris-

dictional controversy between the two unions.

The question presented by this record, then, is whether, regardless of respondent's good labor record, the discharge of the four employees in accordance with the maintenance of membership contract with the A. F. L. violated § 8(1) and § 8(3) of the Act.

The Act in itself, as it read in 1946, before the passage of the Taft-Hartley Law, 29 U.S.C.A. § 141 et seq., expressly validated such clauses and discharges made under them. Section 8(3), in its pertinent portion, read as follows: "* * * nothing in sections 151–166 of this title or in any other statute of the United States, shall preclude an employer from making an agreement with a labor organization (not established, maintained, or assisted by any action defined in said sections as an unfair labor practice) to require as a condition of employment membership therein, if such labor organization is the representative of the employees as provided in section 159(a) of this title, in the appropriate collective bargaining unit covered by such agreement when made."

Under this statute the closed-shop agreement is valid, and the discharge of an employee for failure to maintain a membership in the collective bargaining unit is not only legal, but required.

Two exceptions to this statutory rule have been established by judicial decision. One, declared by the Supreme Court in Wallace Corp. v. National Labor Relations Board, supra, holds that the statute does not apply in a case where a company union, established, maintained or assisted by an employer, insists upon a closed-shop contract, with the express purpose of compelling the discharge of a large group of employees. The court there said that an employer may not discriminate against employees active on behalf of an organization rival to the bargaining representative, "through the medium of a 'union' of its own creation." [323 U.S. 248, 65 S.Ct. 242]. The essential element of the Wallace Corp. case held to take it out of the purview of the statute is the existence of a union set up, maintained or used by the employer. But here it is neither charged

nor shown that respondent built up, maintained or assisted this A. F. L. union.

Also the Supreme Court in the Wallace Corp. case comments that the finding of the Board established the fact of the abiding hostility on the part of the company to any recognition of a C. I. O. union, stating that "The company apparently preferred to close down this one of its two plants rather than to bargain collectively with the C. I. O." The court points out that by the execution of this contract the company was able to achieve that which the Board found was its object from the beginning, namely, to rid itself of C. I. O. members categorized by its foreman as "agitators."

The background of the instant case shows by the undisputed facts on consideration of the whole record, 29 U.S.C., § 160(e), and (f), 29 U.S.C.A. § 160(e, f), that the respondent has no hostility toward the C. I. O. The C. I. O. was the bargaining representative in the Saginaw plant from 1937 to 1939, at which time Homer Martin, president of the union, led the local into the A. F. L. Respondent states in its answer, and it is not denied, that at the present time it operates five plants in which the C. I. O. is bargaining representative. It appears from the positive testimony of a number of the employees, witnesses for the Board, that the management at the Saginaw plants in no way interfered with or objected to membership in the C. I. O. Stoner, Wilson and Poquette all testified that the management never asked them not to join the C. I. O. Harvey stated that the management never approached him as to his C. I. O. affiliations. Knapp, at whose house the C. I. O. meeting was held in April, 1946, although his C. I. O. activities were a matter of common knowledge and although he was charged with disloyalty to the A. F. L. union, was exonerated and not expelled nor in any way hindered in his work with respondent. In fact respondent's relationship with the men seems to have been on the whole harmonious. The witnesses, including Boyd, said that the strike which occurred in 1940 to 1941 was not entered into because of any complaint against the respondent. The controversy in this case is plainly shown

to have been between two rival union groups, with the respondent a stakeholder, as it were, between them.

Another distinction is that here the closed-shop provision was not, as in the Wallace Corp. case, part of an entirely new contract entered into for the express and particular purpose of bringing about the discharge of C. I. O. sympathisers. It was first embodied in a written contract executed May 16, 1944, at a time when the particular transactions of 1945 and 1946, which are the crux of this controversy, could hardly have been within the contemplation of the parties. This contract was renewed in 1946 in a written agreement effective as of May 16, 1946, which in all substantial particulars was identical with the contract of 1944, and was made applicable to the different plants by supplemental agreements. The contract of 1946 had no peculiar application to the Saginaw plants except for the day-to-day provision above described, necessitated by the pendency of the certification proceedings instituted by the C. I. O. The closed-shop provision was identical in the two contracts of 1944 and 1946. It reads as follows: "All employees covered by this agreement who are or may become members of the Union must remain members of the Union in good standing for the duration of this agreement."

The closed-shop feature of the contract, then, was not framed as a means of reprisal against C. I. O. employees. Moreover, here only four employees were discharged, a fifth being acquitted by the union. The union did not even attempt to expel any others of several hundreds who had signed declarations of adherence to the C. I. O., and no proposal for discharges on this ground was made by respondent.

The second exception to the statutory rule is an extension of the doctrine of the Wallace Corp. case declared in certain circuit court decisions. Cf. National Labor Relations Board v. American White Cross Laboratories, Inc., 2 Cir., 160 F.2d 75, and Local 2880 v. National Labor Relations Board, 9 Cir., 158 F.2d 365. In each of these cases the expulsion by the union was due to legitimate union activities engaged in by employees on behalf of rival organ-izations, and the employer was expressly notified of the reason for the expulsion. Here the union gave no such notice, and the charges upon which the expulsion was founded covered activities not protected by the National Labor Relations Act.

National Labor Relations Board v. Federal Engineering Co., 6 Cir., 153 F.2d 233 has no bearing on the instant problem. It involves a case where the discharged employees had not been expelled from the union, and so the closed-shop contract did not come into force. It presents the usual situations of discharge for union activities.

It is now asked that a further exception to the statute be made in this case. The Board has held that if the motive of the union is the discharge of C. I. O. adherents, and if the employer knew this, the contract is invalid. This is not the holding of the Wallace Corp. case, except for a union dominated by the employer. Moreover, neither in the adjudicated cases nor in the Rutland Court Owners, Inc., case, 44 N.L.R.B., 587, was the entire bargaining contract set aside, as in this case. The relief allowed there was reinstatement of the employees found to have been discriminated against. In Colonie Fibre Co. v. National Labor Relations Board, 2 Cir., 163 F.2d 65, which turned upon a provision making the closed-shop agreement effective some eight months before the contract was adopted, only the retroactive provision was held to be void. Thus an unusually drastic penalty is exacted in this case, for the respondent is ordered to cease and desist from giving effect at its Saginaw plants to the contract of May 16, 1946, in its entirety.

We think the exception to § 8(3) put into effect by the Board is not authorized by the statute nor by the decisions of the courts. Reading the whole record in the light of the present provision of the statute covering our power of review as to the facts, 29 U.S.C., § 160(e) and (f), 29 U.S.C.A. § 160(e, f), we find that the motive of the union is not shown to have been the discharge of C. I. O. members. Boyd's trial was upon a charge not related to C. I. O. activities, namely, that of abusing his fellow-members of the union. The same trial committee which convicted Boyd

acquitted Knapp, and thereby indicated that it was not trying to discharge C. I. O. members generally. Not the slightest evidence of improper motive is shown in the letters of expulsion sent by the international president. He acted under the procedure established in the International A. F. L. constitution, and the uncontradicted testimony is that he relied upon the record, which showed that Stoner, Harvey and Harris had engaged in activities not protected by the National Labor Relations Act. The fact that under the statute an employee is protected in certain activities does not protect him from expulsion for activities not protected by the Act and condemned by the union constitution.

The Board itself has ruled that there are limits to the doctrine that dual unionism is under all circumstances an absolute protection against discharge under a closed-shop contract. In Southwestern Portland Cement Co., 65 N.L.R.B. 1, while the Board adhered to its doctrine laid down in the Rutland Court case, supra, that the rival union activities of an employee which occurred during the period toward the end of the current term of an existing contract are protected, it held that early commencement of activities on behalf of a rival organization tended to undermine the status of the collective bargaining agent in the middle of a contract term and did not show that the discharged employee was merely trying to replace one bargaining agent by another. The Board held that activities thus engaged in were not pursued at an appropriate time, and were not in the exercise of a right granted by the Act.

As to the discharge of Boyd, the application of this doctrine plainly required that his dismissal be upheld. It is uncontradicted on this record and in fact is expressly admitted by Boyd that he started his harassing activities and his intrigues with the C. I. O. in September, 1945, while respondent and the A. F. L. were operating under an agreement which expired May 15, 1946. Boyd himself states that while he was an officer of the A. F. L. he adopted the policy of making innumerable complaints, and endeavored to embarrass the bargaining committee. He worked this

plan out in October, 1945, and thus tried to undermine the union in the middle of the contract term. As the Board stated in the Southwestern Portland Cement Co. case, supra, such dual unionism is not protected by the Act. The contract of May 16, 1946, between the A. F. L. and respondent was not in force when Boyd was expelled from the union on May 6, 1946; but the contract of May 16, 1944 was in effect, with its closed-shop provision, up to the renewal of the contract of 1946. Boyd's discharge was demanded by the union on May 11, 1946. The fact that respondent did not accede to the demand until May 16 does not deprive respondent of its protection under the closed-shop provision. The 1946 contract was a mere extension of the 1944 contract, with identical closed-shop provisions. It was so treated by the parties. It covered and applied to employees whose union status had been properly questioned and whose cases were pending before the employer prior to the expiration of the 1944 contract.

We find upon consideration of the whole record that Boyd, Stoner, Harris and Harvey were expelled from the union for activities not protected by the Act, and that their discharge by respondent was legal and proper.

The practical scope of the holding made below and asked to be enforced here is that a corporation which has always maintained a hands-off attitude in union affairs is compelled to pry into union matters where a closed-shop contract exists in order to decide what motive underlies the filing of regular union charges and their enforcement through proper union procedure. This contradicts the spirit of the rule repeatedly declared as to espionage. Spying on union membership and prying into union affairs has been declared in many cases to constitute a violation of the Act. Cf. Ohio Power Co. v. National Labor Relations Board, 6 Cir., 115 F.2d 839; Atlas Underwear Co. v. National Labor Relations Board, 6 Cir., 116 F.2d 1020; Press Co., Inc., v. National Labor Relations Board, 73 App.D.C. 103, 118 F.2d 937, certiorari denied, 313 U.S. 595, 61 S.Ct. 1118, 85 L.Ed. 1548; National Labor Relations Board v. Calumet Steel Division of

Borg-Warner Corp., 7 Cir., 121 F.2d 366; National Labor Relations Board v. Collins & Aikman Corp., 4 Cir., 146 F.2d 454. The Board itself has held in In the Matter of Alaska Juneau Gold Company, 2 N.L.R.B. 125, that an employer has no right to pass judgment on what occurs at union meetings nor to inquire into the manner in which labor organizations conduct their internal affairs. It pointed out: "The right to self-organization and to bargain collectively must be free from interference with and restraint of any kind by the employer. This right would be a sham and a mockery were the manner of its exercise subject to the approval or disapproval of the employer. The desire, pretended or real, of the employer to protect his employees against the dire consequences envisaged as flowing from the exercise of such right cannot serve as a justification for an inquiry by the employer into the internal affairs of labor organizations."

Moreover, this decision requires the employer to go behind the judgment of regular union tribunals and in effect to retry the case.

The dilemma of the neutral employer required to take a hands-off attitude toward union matters or to be found guilty of domination and coercion, and at the same time at its peril to decide whether men deprived of union membership under valid charges and after due and orderly procedure are being dismissed because of dual unionism, is one which should be avoided. Unquestionably one of the underlying purposes of the National Labor Relations Act is to protect employees who desire to change their bargaining representative; but neither the Wallace Corp. case nor the Act puts upon the employer in a union shop the duty asserted here.

In summary, we hold that the statute does not authorize, and the Wallace Corp. case, supra, and the other decisions relied on by the Board do not support the order in the instant case. If a new exception to the statute is to be erected, to apply to a case where no domination, assistance or coercion exists between employer and union, where the unfair labor practices charged are found by both the examiner and the Board not to exist, and where, wholly apart from advocacy of a rival union there is reason for expulsion of certain employees from the union, then either the Supreme Court or the Congress should declare that such is the law.

The petition for enforcement is denied.