**NATIONAL LABOR RELATIONS BOARD v. VERMONT AMERICAN FURNITURE CORPORATION.**

No. 209, Docket 21596.

United States Court of Appeals
Second Circuit.

Argued May 9, 1950.

Decided June 5, 1950.

David P. Findling, Associate General Counsel, A. Norman Somers, Assistant General Counsel, Frederick U. Reel and George H. Plaut, all of Washington, D. C., for petitioner, National Labor Relations Board.

Warner, Stackpole, Stetson & Bradlee, Richard J. Walsh, and Franklin N. Cunningham, all of Boston, Mass., for respondent, Vermont American Furniture Corporation.

Before SWAN, AUGUSTUS N. HAND and CHASE, Circuit Judges.

AUGUSTUS N. HAND, Circuit Judge.

The respondent is a New York corporation engaged in the manufacture and sale in interstate commerce of furniture, having its factory at Orleans, Vermont. It purchased its factory in 1946 and operated it at full capacity with a large backlog of orders up to the beginning of the year 1948. Shortly thereafter the backlog of orders decreased and in February 1948 it was decided by the management according to the testimony of its treasurer Kahn to discharge unessential employees. But there was testimony on behalf of the Board that on January 29, 1948, an organizer for the Upholsterers' International Union of North America AFL named Ingles began a campaign to organize the production employees of the respondent at its Orleans plant; that this man called at the homes of employees and obtained signatures to union cards; that on February 11 another organizer held a meeting for prospective union members

at a private home in Orleans which was attended by ten of the production employees; that at this meeting after the organizer had received certain signed membership cards and handed out blank cards for signature by other employees, those present elected employee Desilets as captain of the organizing team within the plant. Desilets testified that during the next few weeks interested employees circulated membership cards within the plant and he alone obtained about twenty signatures. In view of the situation Kahn called the company's head office in New York and advised his superiors of the union activities who, according to his testimony, "didn't think there was anything much to it." But Desilets testified that on February 27, 1948, Knuckles, the superintendent of the plant, called him to the office and told him that he would have to drop his union activities or the company would have to let him go, whereupon Desilets said that he told Knuckles he would withdraw from the union and its activities in order to hold his job. The employee Belnap testified that on February 28 he was asked by Knuckles whether he was going to be a union man or company man, and when Belnap said he would like a little time to think it over was paid off and discharged. Shortly after Belnap was discharged Roehner, the manager of the plant, called together the employees of the finishing department and two different groups of employees making up the rest of the production workers and told them that he did not feel that a union would benefit them. Marie Nadeau, an employee, testified that at the first meeting on February 28 the plant manager Roehner advised the employees to throw away their cards and forget about the union and said that the company would close its doors if the union came in and that it proposed to give a bonus and more wages to its workers. At that meeting Mrs. Nadeau openly disagreed with the promises made by Roehner and, according to her testimony, said that it would be to her advantage for the union to come in.

Dukett testified that on March 2 Knuckles, the superintendent, called him into the office and asked whether he had signed a union card. When Dukett admitted that he had, Knuckles was said to have warned him that he should cease union activity, and Dukett promised to do so.

■ On March 4, the union held a meeting at the Hotel Barton, about nine miles from Orleans. Treasurer Kahn and superintendent Knuckles entered a lounge which was just off the lobby, and a few minutes later were joined by Roehner. The examiner and the Board held that the presence of these men was an unjustifiable surveillance of the employees and that it constituted an unfair labor practice. Their simultaneous presence in the neighborhood of the union meeting seems to have had no real excuse and, we think, was justifiably held to have constituted an unfair labor practice. It is hard to imagine that these men just *happened* to be at that place at the same time and that their object was not to discover what employees were active in the union, rather than to enjoy each other's society.

Marie Nadeau, Desilets, and Dukett, each of whom had attended the meeting of March 4, were paid and laid off on March 5. There was testimony that upon handing Desilets his check, Kahn told him that he had not "kept his word," that is to say, had not ceased union activity. When Kahn handed Nadeau her check, according to her testimony, he told her that she had no business at the union meeting.

The respondent insists that the dismissals of its four employees were due to the slackness of the company's business, and for reasons relating to the conduct or proficiency of the employees, and not to their union membership or activities. But how far the former factors, rather than their relations with the union, affected the discharges was a question of fact which the Board resolved in favor of the employees' contention that they were penalized for connection with the union.

The respondent argues that the ill-tempered remarks of Mrs. Nadeau about the company's supervisors furnished sufficient justification for her discharge. But these remarks were found to have been made at a time after the discharge occurred, and they might well have been the result of

844

irritation caused by losing her job. It was within the province of the Board to disregard them when it believed that the discharge had really been due to her connection with the union. Much the same considerations apply to the alleged threats of Belnap to the foreman. These were answered by contradictory evidence on his part. The same is true as to the question of Dukett's slowness as a workman and his excuses for absences. It was a matter for the Board to resolve on conflicting testimony.

In respect to the charge of improper surveillance, there was abundant proof to sustain it. The inference that the real reason for the discharges was union activity can readily be drawn from the evidence before the Board. Desilets was rehired in a relatively short time after his discharge. There was good ground for holding that he was laid off on March 5 because he had been the leader of the unionized employees, and not because of a shortage of business at the plant. When Belnap in the week following his discharge asked for reinstatement he was, according to his testimony, again asked whether he would be a "union man," and replied, as he had done originally, that he would think it over. Nadeau had shown herself aggressively pro-union, and Dukett, though warned on March 2 against adhering to the union, nevertheless attended the meeting at the Hotel Barton on March 4. In view of all the testimony showing interference with union organization, we cannot regard the denials by the respondent's officials of the testimony of the employees that they were threatened or coerced as sufficient to overcome the findings to the contrary, supported as the findings were by substantial evidence or reasonable inferences.

We recently held in National Labor Relations Board v. Universal Camera Corp., 2 Cir., 179 F.2d 749, certiorari granted, 70 S.Ct. 998, that the provisions of the Taft-Hartley Act, 29 U.S.C.A. § 141 et seq., effected no change in the review accorded decisions of the National Labor Relations Board. But here there was sufficient substance in the evidence against the respondent to justify the decision of the Board even though what appears to be the somewhat broader scope of review adopted by the Sixth Circuit be assumed. See Pittsburgh S. S. Co. v. National Labor Relations Board, 180 F.2d 731.

Upon the record before us, there was enough to justify the finding that there was discrimination against the four employees because of their union activities and that the employer interfered with and coerced its employees in violation of Section 8(a) (1) of the Act, 29 U.S.C.A. § 158(a), (1).

The petition to enforce is granted.