**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**R. C. MAHON COMPANY, Respondent.**

No. 13625.

United States Court of Appeals
Sixth Circuit.
July 17, 1959.

Lawrence Ollason, Tucson, Ariz., for appellant.

Jack D. H. Hays, U. S. Atty., Michael A. Lacaginina, Asst. U. S. Atty., Tucson, Ariz., for appellee.

Before MATHEWS, BAZELON and BARNES, Circuit Judges.

Owsley Vose, Washington, D. C., (Jerome D. Fenton, Thomas J. McDermott, Marcell Mallet-Prevost and William J. Avrutis, Washington, D. C., on the brief), for petitioner.

Charles Wright III, Detroit, Mich. (Beaumont, Smith & Harris, Detroit, Mich., on the brief), for respondent.

Before ALLEN, McALLISTER and MILLER, Circuit Judges.

ALLEN, Circuit Judge.

The National Labor Relations Board found that respondent had discriminated in regard to the hire and tenure of employment of Arthur J. Bussel and Edmund Warznie on December 3, 1954, and Claude V. Peters on December 4, 1954. It was ordered that respondent immediately reinstate the named employees and make them whole for loss of pay. Also, the Board found that respondent closed its plant protection department on December 31, 1954, and terminated the employment of all its plant protection employees on that date in violation of Section 8(a) (3) of the Act, 29 U.S.C.A. § 158(a) (3), and ordered respondent to reopen its plant protection department and offer to all employees discharged on December 31, 1954, immediate and full reinstatement with back pay.

This order was a two-to-one decision, one member of the Board dissenting. Also, the order rejected the recommendation of the trial examiner that the complaint be dismissed in its entirety.

The case arises out of the following facts, in general not disputed: Respondent, a Michigan corporation operating partly in Detroit and engaged in interstate commerce, was a manufacturer, erector, and fabricator of steel and metal products, at the plant involved herein at which respondent employed around 2,000 people. During 1953 it had plant guards numbering from fifteen to eighteen, one Rudolph Franson being the Chief. Harry Lowther, secretary-treasurer of the company, was directly responsible for all personnel decisions and plant protection. His assistant was Joseph P. McNally.

In 1954 respondent's business substantially declined. The booked orders for 1953 totaled some $44,000,000 and for 1954 less than $30,000,000. The booked orders for the first quarter of 1953 were approximately $14,000,000, while for the third quarter of 1954 they totaled some $4,000,000. The trial examiner found that as a result of this financial difficulty a curtailment in general expenses of operation was made by respondent throughout the entire plant. It discontinued certain consultant engineers, substantially cutting down its selling and ad-

ministrative expenses, thereby reducing general manufacturing, production and erection overhead expenses 30%. Through elimination of clerical personnel the payroll was cut more than $25,000 in 1954. At the request of R. C. Mahon, president of the company, figures on the cost of operating the plant protection department were submitted to Mahon, who talked with Lowther in 1953 about the possibility of respondent's contracting for plant protection instead of employing plant protection guards.

Lowther and Mahon were each ill for most of the latter part of 1954. Both men died in the spring of 1956 prior to the hearing in this case. During 1954 George McKeough, personnel manager, was also ill and absent for considerable periods. During October, 1954, the structural steel plant was taken out of operation because structural steel fabrication cost from $20 to $50 a ton more than it was selling for at the time. The structural steel plant was closed for some six weeks.

Respondent had dealt with unions on a large scale since 1945, its production employes being represented by the Steel Workers of America. In the associations of steel operators to which respondent belonged it contracted with the Bridge, Structural and Ornamental Iron Workers' union, the Sheet Metal Workers' union and many types of AFL construction workers. It had no record of union hostility.

Late in 1954 Arthur Bussel, plant guard, gave a few of the guards some union application cards. In 1949 the guards had been represented by the Amalgamated Plant Guard Workers' union, but after two abortive meetings the movement died out. Bussel's passing the cards was the only union activity among the guards during 1954. The incident was reported to Chief Franson, who was told by McNally to transfer Bussel from the night shift to the day shift. This transaction was authorized by Lowther in order to ascertain whether Bussel was distributing union cards or soliciting on respondent's time. On De-

cember 3 Bussel and Warznie received termination slips. Franson testified that McNally ordered him to lay off Warznie "so that it would not look so obvious" and to lay off Peters because Peters had said the union was the only way they could get security. McNally categorically denies making these two statements. Wherever McNally's testimony and that of Franson are in dispute the trial examiner believes McNally. The reason set forth on the termination slips was "reducing force". An additional notation made by Franson on his own authority was that the employees would not be rehired and that their work was "fair". On the following day Peters was terminated.

In May, 1953, Associated Patrol Service, hereinafter called Associated, which furnishes guard service under contract, solicited respondent's business and submitted details and propositions concerning its rates, etc., to Lowther, but no immediate action was taken. On December 3, 1954, Associated again called on Lowther, repeating its former proposal to supply the plant guard service by contract. By eliminating the overtime item, at Lowther's suggestion, Associated reduced the cost approximately $400 per month. Around December 4 McNally obtained bids from other plant protection concerns. On December 6 a memorandum posted in the plant advised plant guards that arrangements were being made between respondent and a firm engaged in plant protection service to contract out the work, the firm furnishing its own personnel, and that respondent's plant guard employees would cease their employment with respondent as of December 31. The plant guards who testified acknowledged that they saw this notice. Plant guards who asked about these arrangements were told that the changeover was just a matter of economy. On December 11 Associated was advised that its bid was accepted and on December 31 all plant guards and Chief Franson received termination slips and the plant protection department was eliminated. Several of the plant guards were hired by

Associated and assigned to respondent's plant.

The majority of the Board found that the company had discriminated in the layoff of Bussel, Warznie and Claude V. Peters and had also violated the Act in eliminating the plant protection department.

The trial examiner found that Franson's interrogation of Peters, Bussel and Gurjack constituted surveillance in violation of Section 8(a) (1) of the Act, but he found that, in view of the isolated character of Franson's conduct, it would not effectuate the policies of the Act to issue a remedial order based on such conduct alone. We think the ruling as to surveillance is not supported by the record. The trial examiner in effect found that McNally was candid and credible and that Chief Franson was not candid and credible. The evidence sustains this finding. Repeated inconsistencies and evasions are shown in Franson's testimony and, as the trial examiner said, Franson exhibited a certain animus toward McNally. The essential facts which are the basis of the finding as to surveillance were testified to by Franson and the most important ones were denied by McNally.

■■ What is established with reference to this incident is that Lowther instructed that a check be made as to whether Bussel while at the plant and during his working hours was doing union work and soliciting on company time. This is far from the spying on union membership and prying into union affairs which is prohibited under the statute. Cf. National Labor Relations Board v. Eaton Manufacturing Company, 6 Cir., 175 F.2d 292. There was no spying upon meetings of the union as was the case in National Labor Relations Board v. Vermont American Furniture Corporation, 2 Cir., 182 F.2d 842. It is not unlawful under the statute for an employer to observe the activities of an employee carried on in the plant and in working time. No company rule is necessary to establish this right.

■ As to the principal question of the case the trial examiner recommended that the complaint be dismissed. He found since a program to curtail administrative expenses and overhead had been established in good faith before this situation arose and contracts had been solicited by independent companies offering plant protection, the elimination of the plant guard department was properly made for financial reasons and did not constitute a violation of the Act. This ruling of the trial examiner was clearly correct. The case falls squarely within the doctrine announced by this court in National Labor Relations Board v. Adkins Transfer Company, Inc., 6 Cir., 226 F.2d 324. Cf. National Labor Relations Board v. Houston Chronicle Publishing Company, 5 Cir., 211 F.2d 848; National Labor Relations Board v. Jones & Laughlin Steel Corporation, 301 U.S. 1, 57 S.Ct. 615, 81 L.Ed. 893.

Altogether respondent's complete lack of hostility toward the union, its financial condition in 1953 and 1954, its efforts to cut down expenses during the entire period, and the fact that two major executives were ill for most of the time involved, dying before the trial, taken together constitute a convincing explanation of the circumstances which two members of the Board considered suspicious with reference to the delayed timing of the elimination of the plant protection department.

■ We find nothing in the National Labor Relations Act which forbids a company, in line with its plans for operation, to eliminate some division of its work. As held in National Labor Relations Board v. Adkins Transfer Company, Inc., supra, an employer faced with the practical choice, either of paying enhanced wage rates demanded by a union or of discontinuing a department of its business, is entitled to discontinue. The findings of fact and conclusions to the contrary made by a majority of the Board are not supported by substantial evidence on the record considered as a whole nor do they accord with the applicable law.

The decree of enforcement is denied.