**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**DOUG NEAL MANAGEMENT COMPANY, Respondent.**

No. 77–1288.

United States Court of Appeals, Sixth Circuit.

Argued Nov. 28, 1979.

Decided April 8, 1980.

Rehearing Denied May 5, 1980.

Elliott Moore, Deputy Associate Gen. Counsel, William Stewart, Anne Andrews, N.L.R.B., Washington, D.C., Emil C. Farkas, Director, Region 9, N.L.R.B., Cincinnati, Ohio, for petitioner.

Stanley Goodman, Ronald K. Rychener, Goodman & Goodman, Cincinnati, Ohio, for respondent.

Before WEICK and KEITH, Circuit Judges and CECIL, Senior Circuit Judge.

WEICK, Circuit Judge.

The Board has applied to this court for enforcement of its order against respondent, Doug Neal, an individual doing business as Doug Neal Management Company, reported at 226 N.L.R.B. No. 157 which modified an order of the Administrative Law Judge and found that Neal had violated Section 8(a)(1) and (3) of the Act by discharging and refusing to reinstate his engineers Epperson, Grooms and Smith because they had engaged in union activities. The Board's order required Neal to offer full reinstatement to their former jobs or, if they did not exist, to substantially equivalent positions; to make the employees whole for lost wages; and to post customary notices. The Administrative Law Judge had ordered the employees reinstated to their former positions as engineers, but since those positions no longer existed or were necessary when equipment was automated, the Board ordered them reinstated to substantially equivalent positions. The trouble is there were no substantially equivalent positions in the bargaining unit.

Neal himself had been employed as Manager of the Kroger Building in Cincinnati, Ohio in September 1974 when that building was owned and operated by Del Webb Corporation.

The Kroger Building is an office building with 25 floors, a basement and sub-basement, and a parking garage. Neal held that managerial position under Del Webb Corporation until December 15, 1975 when Realty Income Trust (Realty) became the owner of the building and Realty continued to employ Neal to manage its building. Actually Realty had previously owned the land on which the office building was constructed and became the owner of the building by forfeiture in 1975.

All of the grievances complained of by the Board took place during the ownership and operation of the building by Realty, and although Realty was the real party of interest in this proceeding, it was never made a party thereto. Thus there was an obvious defect in the parties which was overlooked and not treated by the Board.

The Kroger Building contains about 330,000 square feet of office space. It has a central heating and air conditioning unit. The major tenant was the Kroger Company. Eight floors of the building contains offices for attorneys, insurance companies, and others. There was a vacancy factor prior to December 1975 of 50 to 60 percent. The building was serviced by Manager Neal and one Chief Engineer, three shift engineers, two maintenance personnel, five parking attendants and one secretary.

The Chief Engineer was Epperson and the three shift engineers were Grooms, Smith and Ballard. The shift engineers worked various shifts during the week in-

cluding Saturdays and Sundays and often worked and were paid for overtime.

All four engineers were members of International Union of Operating Engineers, Local 20, AFL–CIO during the ownership of Kroger Building by Del Webb Corporation and Realty. The Union, however, was not the collective bargaining representative of the four engineers.

There was not an iota of evidence in the record of any anti-union bias or prejudice on the part of Neal, Del Webb Corporation or Realty.

After Realty became the owner of Kroger Building it made a survey of the operations of the building. It was faced with vacancies of 50 to 60 percent in the building and high operating costs and expenses resulting principally from the employment of four engineers consisting of a Chief Engineer and three shift engineers. The survey indicated that large sums of money would be required to make improvements in the building to make the offices more tenantable and that operating expenses would have to be reduced. In a meeting between Neal and the owners of the building in December 1975, a determination was made to do away with the positions of operating engineers in the building. This could only be done by incurring additional expense to automate the heating and air conditioning equipment in the building.

In meeting with Epperson on January 17, 1976, Neal informed him of the decision of the owner to go to an automated system. Neal testifed:

"A Yes sir . . . the conversation . . . if I may, I explained to Ken the expressed desire of the new owner, in order to cut back operating expenses, to terminate the operating engineers, which was in excess of $70,000.00 a year in salaries, overtime and fringes. The new owners had the privilege, both the privilege and the desire to save that amount of money and we discussed the fact that automating the equipment . . . after the inspection was made by the new owners, I didn't want to get rid of the people that I had working for me, so I got temporary permission from the owners to make Ken Building Superintendent, terminate the 3rd shift engineer, eliminate excessive overtime and then, after we realized the savings, if any, by doing this, we would then give the two operating engineers an increase of pay, reclassify them as maintenance people, not as engineers, but just as maintenance people, regular maintenance people, with an increase in salary. Ken felt they should be given this increase immediately, the fact was the Kenner people had not, as yet, paid any rent. The new owners had invested $400,000.00 in tentative improvements costs, so really there was no money in the pot." App. pp. 99–100.

Epperson testified:

"THE WITNESS: The Building Manager, Doug Neal, came in and called me into his office and he said he wanted us to make some changes. He wanted to cut out the overtime, cut out the 11:00 to 7:00 engineer, also the engineer on Saturday and Sunday; he wanted to discharge one of the engineers, Bryon Ballard and he would retain Charles Grooms and Roy Smith. He would give them a raise and I asked him how much and he didn't say, but he said if they didn't like the raise, he would give them 3 weeks severance pay; he wanted to make me Building Superintendent and give me $20.00 a week increase, based on a 40 hour week. He would furnish me a private office and clothes and 3 weeks vacation.

He also said Walter Fuller, which was his boss in Realty Income Trust, wanted to eliminate the contract, all contracts. He wanted to keep the one, Otis Elevator and the Trane Company.

So, he asked me what I thought about what he had to say and I said, "Well, I will think it over." so he says, you know, to let him know on Monday and that was about the end of the discussion.

Q I think you testified he said he would lay off or discharge the night man and not have individuals working on weekends, is that correct?

A Right. He also said that he would divide Bryon Ballard's salary among the rest of us engineers.

Q Did he say anything as to who would do the work on the night shifts or on weekends?

A He said he would have the guards, the security, take over the operation of the equipment.

Q Is that all that you recall of that conversation?

A That is all that I recall." App. pp. 15–16.

Following Epperson's meeting with Neal, he met with Grooms and Smith and they decided to meet with Stan Inman, Business Agent of Local 20, rather than accept Neal's offer. The engineers decided to file with the NLRB and signed union representation cards. Inman then interviewed Neal who called Epperson and Grooms to his office that afternoon.

Epperson testified:

"Q Did anything unusual happen that day?

A Yes, that afternoon at 3:00, Doug Neal called Charles Grooms and myself into the office and he wanted to know where Roy Smith was and we told him he had gone home.

Q Is Roy Smith another engineer?

A Right, another engineer. And, he had finished his shift for the day. He said, "Well, boys, I hate to do this, it is always hard for me to do it, but, Realty Income Trust has terminated you engineers." and he said, "I have never worked with a nicer bunch of guys and if you ever need a reference, just call me. And, Charles asked him—Charlie Grooms—asked him, "Does that mean we are fired", and he said, "You are terminated.", so I told him, I said, "Well, you know this is not the end of this," and he said, "Yes, I know, you guys do your thing."

So, he asked for our keys and gave us a paycheck." App. p. 20.

The Kroger Building has now been automated and it does not require the services of a single engineer. It has resulted in the savings of the salaries and overtime of four engineers. Considerable sums were spent by Realty for improvements in the offices and for automating of the heating and air conditioning equipment. The result is that very little vacancies now exist.

█ It is almost unbelievable that it was ever necessary to employ four engineers in order to operate and maintain a 25 floor office building. Nevertheless, the owners of the building have incurred this unnecessary expense for a number of years. When Realty sought to relieve itself of this unnecessary expense by automating its heating and ventilating equipment, the engineers who desired to retain their positions called upon their union for help, although the union had never been certified by NLRB as their bargaining representative. Unfair labor practice charges were filed against Neal but not against the owner Realty. All Neal did was to carry out the instructions of the owner in notifying the engineers. Merely because an employee belongs to a labor union does not mean that he has a lifetime job and that the employer may never dispense with the services of an unnecessary employee.

█ The Board claims that the engineers were discharged because of their union activity. The record, however, shows rather clearly that they were not discharged for their union activity but that their positions as engineers were terminated by the owner of the building as being no longer necessary because of the automated equipment.

It is noteworthy, as before stated, that no anti-union bias or animus was shown to have existed on the part of Neal, Realty or Del Webb. They all got along fine with the engineers and even tried to help them. They never objected to any of the engineers belonging to the union.

The law in this circuit is well settled. In *N.L.R.B. v. R.C. Mahon Company*, 269 F.2d 44, 47 (6th Cir. 1959), we stated in an opinion written for the court by Judge Florence Allen:

"Altogether respondent's complete lack of hostility toward the union, its financial condition in 1953 and 1954, its efforts to cut down expenses during the entire period, and the fact that two major executives were ill for most of the time involved, dying before the trial, taken together constitute a convincing explanation of the circumstances which two members of the Board considered suspicious with reference to the delayed timing of the elimination of the plant protection department.

We find nothing in the National Labor Relations Act which forbids a company, in line with its plans for operation, to eliminate some division of its work. As held in *National Labor Relations Board v. Adkins Transfer Company, Inc., supra*, an employer faced with the practical choice, either of paying enhanced wage rates demanded by a union or of discontinuing a department of its business, is entitled to discontinue. The findings of fact and conclusions to the contrary made by a majority of the Board are not supported by substantial evidence on the record considered as a whole nor do they accord with the applicable law.

The decree of enforcement is denied."

In *N.L.R.B. v. Lassing*, 284 F.2d 781, 782, 783 (6th Cir. 1960), per curiam, we stated:

"This case presents basically the same question considered by this Court and decided adversely to the Board's contention in *N.L.R.B. v. Adkins Transfer Co.*, 6 Cir., 226 F.2d 324, and *N.L.R.B. v. R.C. Mahon Co.*, 6 Cir., 269 F.2d 44. We there held that a company may suspend its operations or change its method of doing business, with the resulting loss of employment on the part of certain employees, so long as its change in operations is not motivated by the illegal intention to avoid its obligations under the National Labor Relations Act. A change in operations motivated by financial or economic reasons is not an unfair labor practice under the Act.

The Board contends that this case is not controlled by the ruling in the *Adkins* and *Mahon* cases because the respondent accelerated its proposed change in operations upon its learning that the three employees had joined the Union and before any demands for increased pay for said employees had been made upon it by the Union, and that such action constituted the discrimination found by the Board to exist.

We do not agree. Although the Union had made no demand for increased pay, the evidence fully justified respondent's belief that such demands would be made and could not be met. Under the circumstances we do not believe it was incumbent upon the respondent to delay the effective date of its new method of operation previously decided upon before the advent of the Union. It will be noticed that the respondent's decision to change its method of operation did not include a commitment to continue under its existing method of operations until April 1, 1959. The date fixed the maximum period of time which would elapse before the change would become effective. The respondent had decided to make the change effective before that date if anything occurred which would increase its costs. The advent of the Union was a new economic factor which necessarily had to be evaluated by the respondent as a part of the overall picture pertaining to costs of operation. It is completely unrealistic in the field of business to say that management is acting arbitrarily or unreasonably in changing its method of operations based on reasonably anticipated increased costs, instead of waiting until such increased costs actually materialized."

We further stated:

"There is no evidence in the present case, and there is no contention made, that there was an anti-union background on the part of the respondent. Fundamentally, the change was made because of reasonably anticipated increased costs, regardless of whether this increased costs was caused by the advent of the Union or by some other factor entering into the picture. This did not constitute discrimination against the three employees with

respect to their tenure of employment because of membership in the Union, within the provisions of Section 8(a)(1) and (3) of the Act. *N.L.R.B. v. Houston Chronicle Pub. Co.*, 5 Cir., 211 F.2d 848, 854.

Since that division of the respondent's business was discontinued and the employment of the three drivers legally terminated, there was no basis for a meeting with the Union later for the purpose of collective bargaining. *N.L.R.B. v. Houston Chronicle Pub. Co.*, supra."

In the unfair labor practice proceeding in the present case, the Regional Director of the Board declined to issue a complaint stating:

"The above-captioned case charging a violation under Section 8 of the National Labor Relations Act, as amended, has been carefully investigated and considered.

The investigation disclosed that on December 23, 1976, the Board certified the Union as the exclusive representative for the following unit: 'All stationary engineers employed by the Employer at its Cincinnati, Ohio location at the Kroger building, but excluding all maintenance men, painters, office clerical employees, professional employees, guards and supervisors as defined in the Act.' The Employer subsequently automated its heating and air conditioning equipment. Employees who previously performed bargaining unit work were reassigned to maintenance work for approximately 85% of their time, with the result that the bargaining unit, for which the certification was issued, apparently ceased to exist. It appears that the certified unit has undergone such a change.

Absent a new determination by the Board in a representation or clarification of a certification proceeding, there is no clear obligation for the Employer to recognize the Union as the exclusive representative of these employees.

Under these circumstances, it was concluded that further proceedings were not warranted and I am refusing to issue complaint."

■ It will be noted that the Board certified only the engineers as the bargaining unit but that unit no longer existed. The Administrative Law Judge made the mistake of ordering reinstatement to the unit which no longer existed. The Board in modifying the order of the Administrative Law Judge ordered reinstatement to substantially equivalent positions. No substantially equivalent position existed. It could hardly be claimed that maintenance men, painters, office clerical employees, professional employees, guards and supervisors as defined in the Act were substantially equivalent to engineers. In any event, they were expressly excluded from the bargaining unit which at this late date has not been changed.

In our opinion the order of the Board is not supported by substantial evidence.

■ There is another reason why enforcement should be denied and that is for lack of an indispensable party. Realty is the owner of the building and is the real party in interest. It was never made a party to this proceeding and its rights cannot be affected by merely making the building manager Neal a party.

■ Under Rule 19 of the Federal Rules of Civil Procedure, "a party is deemed indispensable . . . only if, in his absence, (1) the absentee is likely to be harmed, (2) one of the parties may be subject to multiple or otherwise inconsistent obligations, or (3) complete relief cannot be accorded to the parties." *Nationwide Auto Transporters v. Morgan Driveway, Inc.*, 411 F.Supp. 755, 757 (S.D.N.Y.1977). As this Court explained in *Boles v. Greenville Housing Authority*, 468 F.2d 476, 478 (6th Cir. 1972):

"Rule 19 . . . provides criteria for determining whether an unjoined party's interests are sufficiently substantial that a court should not proceed to a decision on the merits in its absence. Where an initial appraisal of the facts reveals the possibility that an unjoined party is arguably indispensable, the burden devolves upon the party whose interests are ad-

verse to the unjoined party to negate the unjoined party's indispensability to the satisfaction of the court."

The *Boles* Court also emphasized that:

".  .  .  the interests of an unjoined party are especially vulnerable in that they are not vigorously asserted by counsel before the court.  As a result it is possible that the true nature and extent of these interests may not be explored until after they are irreparably prejudiced."  Id. at 479, n.3.

Furthermore, "in the absence of an indispensable party, the federal courts are no more empowered to render a declaratory judgment than we would be to give affirmative relief."  *Kimball v. Florida Bar*, 537 F.2d 1305, 1307 (5th Cir. 1976).

The presence of an indispensable party "is required in order that the court may make an adjudication equitable to all persons involved."  3A Moore's Federal Practice ¶ 19.05(2).  Indeed, "it is not necessary that an absent person would be bound by the judgment in a technical sense.  It is enough that as a practical matter his rights will be affected."  Id. at ¶ 19.07–1(2).–1).  Further, "where such a community of interest exists that no decree can be rendered without affecting the interest of the absent party, that party is indispensable.  And a community of interest may arise out of contracts which, while several in form, are interdependent in substance and operation."  Id. at ¶ 19.18(1).

■ It is noted that the issue of the indispensable party has not been raised previously does not preclude this Court, sua sponte, from raising it now.  In *Boles, supra* at 479, ".  .  .  Rule 19 was neither litigated at the trial level nor briefed on appeal.  Nevertheless, the record before us makes it clear that HUD is at least arguably indispensable."  The Court of Appeals stressed that it did "not hesitate to raise the indispensable party question on our own motion:  "When necessary  .  .  .  a court of appeals should, on its own initiative, take steps to protect the absent party, who of course had no opportunity to plead and prove his interest below."  *Provident*

*Tradesmens Bank and Trust Co. v. Patterson*, 390 U.S. 102, 111, 88 S.Ct. 733, 738, 19 L.Ed.2d 936 (1968)."  Id. at 479, n. 4.  *See also Kimball v. Florida Bar, supra* at 1307; *McShan v. Sherrill*, 283 F.2d 462, 464 (9th Cir. 1960); *Haby v. Stanolind Oil and Gas*, 225 F.2d 723, 724 (5th Cir. 1955); Wright and Miller, *Federal Practice and Procedure*, Section 1392, n. 58 ("Lack of an indispensable party is a jurisdictional issue and may be raised at any time, on appeal or at trial.");  3A Moore's Federal Practice ¶ 19.-07–2(0) (".  .  .  an appellate court will raise lack of an indispensable party on its own motion.")

■ In the case at bar, it appears to this Court, from the record before it, that the owner of the Kroger Building is an indispensable party, especially since the Board has ordered reinstatement of the three discharged employees.

The decision in *Eldredge v. Capenters 46 Northern California*, 440 F.Supp. 506 (N.D. Cal.1977), presents a situation somewhat analogous to the case sub judice.  *Eldredge* was a civil rights action brought by female applicants for positions as beginning apprentice carpenters, against a joint labor-management apprenticeship and training committee.  The Court explained that:

"The relief contemplated in this case, however, will have substantial impact on both the employers who must hire apprentices if they are to receive on-the-job experience and the unions which pursuant to collective bargaining agreement are responsible for the dispatch of all employees to jobs with signatory employers.  Rule 19 does not, or course, require joinder of all parties who may be affected by an order.  The issues are, first, whether employer or union involvement is of such a nature that without them complete relief cannot be accorded those already parties, Rule 19(a)(1), and, second, whether their interests are such that to proceed in their absence may as a practical matter prejudice them or subject the parties already before the Court to a substantial risk of incurring inconsistent obligations, Rule 19(a)(2).  If either of these

conditions is shown, Rule 19(a) requires that the absent parties be joined if to do so will not deprive the Court of jurisdiction over the subject matter. If a party cannot be joined as required, Rule 19(b) calls for a second inquiry to determine whether in equity and good conscience the action should be dismissed." Id. at 518.

The *Eldredge* Court also cautioned that: "Although the legal position of the present defendant and its theoretical ability to comply with an order are relevant, they may be outweighed by a finding that absent parties may as a practical matter prevent the full realization of the intended relief. The Court must guard against the formulation of 'paper' decrees which neither adjudicate nor, in the end, protect rights." Id. at 519.

Finally, the district court emphasized that "the presence of a party who is already defending employer interests to some extent (does not) obviate the need for joinder." Id. at 523.

For the reasons hereinbefore stated, enforcement is denied.

KEITH, Circuit Judge, dissenting.

I respectfully dissent from the position that the application by the National Labor Relations Board for the enforcement of its order in this action should be denied. I cannot agree that "[t]here was not an iota of evidence in the record of anti-union bias or prejudice on the part of Neal, Del Webb Corporation or Realty."

Determinations of the Administrative Law Judge, whose responsibility it is to assess the credibility of the witnesses and determine the facts in the first instance, are entitled to be upheld if supported by substantial evidence. In this case, the ALJ found after weighing the evidence, that Neal was opposed to his employees securing the protection of a union contract, and decided to preclude the possibility of bargaining for a contract that he did not want by discharging the engineers without prior warning, and camouflaging the discharges under the umbrella of automation. The

ALJ concluded that while it was possible that some consideration was being given to automation prior to the discharges, the immediate adoption and acceleration of the automation process was but a further implementation of the decision to discharge the engineers.

The ALJ supported his finding that no decision to automate had ripened at the time of discharge—that, rather, automation was merely one of several alternatives under consideration—with testimony to the effect that on February 6, Neal told one of the engineers after his discharge that he would have to call in a servicing contractor. In addition, the ALJ credited the contractor's testimony that he was told to take over the work on February 6 after the discharged engineer was told by Neal that a servicing contractor would have to be called in.

Moreover, the ALJ found that Neal presented no credible evidence of economic necessity. To the contrary, Neal's offer of a salary increase to the engineers remaining after the earlier contemplated discharge of only one engineer militates against the defense of economic necessity, as does Neal's own claim that he told Epperson, after the decision to automate had been made, that if he eventually found that he did not need Grooms and Smith as engineers, he would reclassify them as maintenance employees. Therefore, from Neal's own testimony comes an admission that the engineers involved in the discharge were to be retained in some capacity even if automation were effected.

In my opinion, there is substantial evidence on this record to support the ALJ's finding of 8(a)(1) and (3) violations of the Act. I would affirm the finding of the violation as well as that part of the NLRB Order that requires the company to cease and desist from the unfair labor practices found, and from "in any other manner" interfering with, restraining, or coercing employees in the exercise of their Section 7 rights. I would also affirm that part of the Order requiring the Company to make the employees whole for lost wages and to post

the customary notices. In addition, I would remand to the Board for a determination, in light of its finding that engineering positions no longer exist at the plant, of the feasibility of its order for full and immediate reinstatement of the employees to their former jobs, or to substantially equivalent jobs.