BON HENNINGS LOGGING COMPANY, Petitioner,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent.

NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

Clayton KNOWLES, an individual, Respondent.

Nos. 17543, 17599.

United States Court of Appeals Ninth Circuit.

Sept. 4, 1962.

4. 268 U.S. 353, 45 S.Ct. 566, 69 L.Ed. 991. See 4 Collier on Bankruptcy 1597 Par. 70.77 [2].

5. Cf. Hulsart v. Hooper, 5th Cir. 1960, 274 F.2d 403.

George O. Bahrs, and R. J. Scolnik, San Francisco, Cal., for petitioner Bon Hennings Logging Co.

Stuart Rothman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Melvin J. Welles, and Elliott Moore, Attys., N. L. R. B., Washington, D. C., for respondent and petitioner N. L. R. B.

Clayton Knowles, Arcata, Cal., in pro. per, for respondent Clayton Knowles.

Before HAMLIN, JERTBERG and BROWNING, Circuit Judges.

HAMLIN, Circuit Judge.

The National Labor Relations Board, after hearings before a trial examiner, found that Bon Hennings Logging Company, hereafter Company, and Clayton Knowles were guilty of certain unfair labor practices in violation of section 8 (a) (1) and (3) of the National Labor Relations Act, hereafter Act, 29 U.S.C.A. § 158(a) (1) and (3). The Company and Knowles were ordered to cease and desist therefrom and the Company (but not Knowles) was ordered to reinstate certain employees with back pay. The Company petitions this court for an order vacating and setting aside the order of the Board, and the Board cross-petitions for enforcement of its order against the Company. The Board also petitions for enforcement of its order against Knowles. We have jurisdiction of the petitions by virtue of section 10 (e) and (f) of the Act, 29 U.S.C.A. § 160 (e) and (f).

Three questions are presented by the petitions which are before us involving (1) the jurisdiction of the Board, (2) the sufficiency of the evidence to show unfair labor practices, and (3) the validity of the Board's order of reinstatement with back pay.

## I. JURISDICTION OF THE BOARD

The Company is a California corporation engaged in the logging business in Humboldt County, California. During 1959, the year here in question, Company performed logging services for Roddis-Craft, Inc., for which Company was paid $324,000. Roddis-Craft is a manufacturer of plywood which ships a substantial amount of its product (a value exceeding $3,000,000 per year) to points outside California. All logging services were performed by Company on property either owned by Roddis-Craft or on which it had cutting rights. Only a portion of the timber cut by Company was suitable for the manufacture of plywood by Roddis-Craft. As a result large quantities of timber cut by Company were shipped to other lumber companies at Roddis-Craft's direction. There is no evidence that any such timber was shipped by Company to points outside California. Of the $324,000 received by Company for logging services $31,600 was the amount paid in respect of the logs actually used by Roddis-Craft.

The Board has jurisdiction to prevent unfair labor practices "affecting commerce".[1] As provided by section 2(7) of the Act, 29 U.S.C.A. § 152(7),

"The term 'affecting commerce' means in commerce, or burdening or obstructing commerce or the free flow of commerce, or having led or tending to lead to a labor dispute burdening or obstructing commerce or the free flow of commerce."

The Company concedes that Roddis-Craft is engaged "in commerce" within the meaning of the Act by virtue of its substantial shipments of plywood to points outside California. Under the standards it has developed, the Board will assert jurisdiction over firms which have a "direct flow" of goods or services in commerce of a value exceeding $3,000,000 per year. The Board determined that Company met its jurisdic-

1. National Labor Relations Act, § 10(a), 29 U.S.C.A. § 160(a).

tional standards of "indirect flow" in that it provided more than $50,000 worth of services for a firm which met the Board's "direct" jurisdictional standard.[2]

Company contends that it did not meet the Board's "indirect flow" jurisdictional standard in that of the $324,000 paid by Roddis-Craft only $31,600 was paid for services rendered to Roddis-Craft and the remainder was for services rendered to the other lumber companies not engaged in interstate commerce to which Company delivered lumber. Company argues that Roddis-Craft merely acted as an intermediary or middleman for the other companies for all the timber except that actually delivered to Roddis-Craft.

We think the Company, notwithstanding its contentions, cannot escape the fact that the entire $324,000 was paid to it for services rendered to Roddis-Craft and not to any other lumber company. The lumber which Company cut and hauled came from property which was owned by Roddis-Craft or on which it held the cutting rights. Delivery of the logs not usable by Roddis-Craft was made to the other companies at Roddis-Craft's direction. These other companies paid Roddis-Craft for the lumber. Roddis-Craft paid the Company for the cutting and hauling. Company clearly came within the Board's jurisdictional standards.

Leaving the jurisdictional standards of the Board aside, we think Company "affected commerce" within the meaning of the Act. Many cases in this Circuit have decided that jurisdiction attaches to companies which purchase from or perform services for other firms which engage directly in interstate commerce even though the companies' business is conducted solely intrastate.[3]

The Company and Knowles rely heavily on N. L. R. B. v. Reliance Fuel Oil Corp., 297 F.2d 94 (2d Cir.1962), cert. granted, 369 U.S. 883, 82 S.Ct. 1160, 8 L. Ed.2d 285 (1962). In that case Reliance was in the business of selling fuel oil to home owners all of whom were in New York. Reliance purchased its fuel, more than $650,000 worth, from Gulf Oil Corporation which was engaged "in commerce". The fuel oil and related products purchased by Reliance was largely refined outside New York and shipped to Gulf's storage tanks in New York. The Board contended that jurisdiction over Reliance existed because its substantial purchases of goods the origin of which was outside the state affected commerce within the meaning of the Act. The Second Circuit refused to hold that these facts alone supported jurisdiction. The court remanded the case to the Board for it to take further evidence *inter alia* on the "volume of commerce in heating oils in the relevant market, Gulf's participation therein, Reliance's contract relationship, if any, with Gulf's national distribution system, and Reliance's proportion of Gulf's commerce in the relevant market."

Company herein contends that the facts of this case are analogous to those of the Reliance case, and that its mere *de minimis* relationship with Roddis-Craft (contending only $31,600 worth of services were performed for Roddis-Craft) is insufficient to support jurisdiction under the rationale of Reliance. We think the cases in this Circuit [4] foreclose an effective contest as to the jurisdiction of the Board in this case. In view of our cases and the factual differences between Reliance and the instant case we find it unnecessary to approve or disapprove of the holding or reasoning of the Second Circuit in Reliance. And we note the lack of finality of Reliance due

2. Siemons Mailing Service, 122 NLRB 81 (1958).

3. E. g., Plymouth Dealers' Ass'n of No. Cal. v. United States, 279 F.2d 128, 135 (9th Cir. 1960); Wayside Press v. N. L. R. B., 206 F.2d 862, 864 (9th Cir. 1953); N. L. R. B. v. Reed, 206 F.2d 184 (9th Cir. 1953); N. L. R. B. v. Howell Chev-

rolet Co., 204 F.2d 79 (9th Cir. 1953), aff'd, 346 U.S. 482, 74 S.Ct. 214, 98 L.Ed. 215 (1953); Zall v. N. L. R. B., 202 F. 2d 499, 500 (9th Cir. 1953); N. L. R. B. v. Townsend, 185 F.2d 378 (9th Cir. 1950).

4. Ibid.

to the Supreme Court's grant of certiorari.[5]

We hold that the Board had jurisdiction in this case.

## II. SUFFICIENCY OF THE EVIDENCE

During 1959, Company employed several truck drivers. On November 1, 1959, almost all of Company's truck drivers attended a meeting which one driver had arranged with a union organizer.[6] After a discussion all of the drivers present signed cards applying for membership in the Union.

On the following Monday morning, November 2, 1959, Bon Hennings, the president and sole stockholder of the Company, heard about the meeting. That afternoon Hennings discussed the Union with a number of his drivers. Hennings asked one driver if he had attended the meeting and he learned that he had. Hennings then questioned this driver as to the advantages of joining the Union and then stated, "there will never be a union man on my job." Another driver who had been accused of being the instigator of the union movement had a conversation with Hennings during which the driver asked Hennings who had been spreading the story (which story was apparently correct) that he was the instigator. Hennings replied, "Well, I will not have any son-of-a-bitch on this job that is union." To still another driver with whom he had a conversation Hennings said in effect "when the union moved in on his job, his job was through."

On the evening of November 2, 1959, Hennings' truck foreman, Clayton Knowles, returned from a hunting trip and received a telephone call evidently informing him of the union activity after which Knowles stated to a companion, "Those sons-of-bitches are going union and I will fire the whole bunch of them."

On Tuesday, November 3, 1959, the Company entered into a lease agreement with Knowles whereby Knowles was the lessee of the Company's trucks and trailers. Knowles was to carry on the trucking part of Company's logging business as an independent contractor for the period of one year commencing November 4, 1959. The leased equipment was to be maintained and repaired by Company. Knowles was responsible for hiring and firing employees, but Company agreed to advance sufficient funds to cover payroll and other expenses. Company was to carry workmen's compensation insurance until Knowles was in a position to acquire his own coverage, and on similar conditions Knowles had the use of Company's fuel permit. The lease was non-assignable. Knowles could cancel the lease on 15 days notice if unable to operate due to inclement weather, and Company could cancel on similar notice if it deemed Knowles' operation to be "unsatisfactory." The financial arrangement was such that in effect Knowles would make his lease payments to Company from funds received from Company in payment for Knowles' hauling services.

On the evening of November 3, 1959, Knowles visited one of the truck drivers at his home and informed him that there would be no work on the following day because "we are going out of business." The driver inquired if this was done "because the boys wanted to go union" and Knowles said, "Yes, that, among other things." On November 4, 1959, one of the drivers who had not attended the meeting of November 1 went to the Company to collect his pay check. Seeing Knowles, he asked whether the shutdown had resulted from "some of the fellows * * * talking union." Knowles replied that that was "partly the reason." This driver volunteered the information that he had had an unsatisfactory experience with a union and that

5. 369 U.S. 883, 82 S.Ct. 1160, 8 L.Ed.2d 285 (1962).

6. The Union was the Brotherhood of Teamsters, Warehousemen & Auto Truck Drivers, Local 684, International Brotherhood of Teamsters, Chauffeurs, Warehousemen & Helpers of America.

if the cause of the shutdown was the union he would be willing to go back to work non-union. Knowles told him operations would resume in about a week.

When discharged truck drivers went to Company on November 4 to pick up their pay checks several of them asked the Company's vice-president and bookkeeper, Pease, if the Company was going out of business because of the union activity. He replied, "That among other reasons" and added that the men should have known better than attempt to organize.

Experiencing difficulty in recruiting new drivers, Knowles was told by Hennings that he (Knowles) "had better start getting * * * some men to go to work." Knowles telephoned a driver named Severson whose work was highly regarded by Hennings and asked him to come to Hennings' residence. When Severson arrived Hennings said that he had asked him over "to find out how you feel about this union business." Severson replied that he felt pretty much the same as the other men. Hennings praised Severson for his excellent work, expressing his dislike of having to lose him, but growing excited, Hennings stated, "There will be no [profanity omitted] union men on my payroll * * I will go broke; I will go bankrupt; I will go plumb out of business."

Hennings and Knowles called a meeting of new drivers and crew on the evening of November 5 and told them to drive the next day. The Union established a picket line at the Company yard early the next morning. Several men drove through the line. One of these men, Curtis, had been a mechanic and relief driver for Company. Although reluctant to break the picket line he did so at Hennings' direction. However, on his return at the end of the day he informed Knowles that he "didn't want to drive that truck through that picket line any more." A day or so later he asked Hennings if he still had a job. Hennings said, "no" that he was fired "for choosing up sides against him, with the Union."

The trial examiner after a hearing and the Board on review found that the actions of Company and Knowles as described violated section 8(a) (1) and (3) of the Act, 29 U.S.C.A. § 158(a) (1) and (3) which reads in pertinent part:

"8(a) It shall be an unfair labor practice for an employer—

"(1) to interfere with, restrain, or coerce employees in the exercise of their rights guaranteed in section 7;[7]

\* \* \* \* \* \*

"(3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization * * *."

Our role in reviewing decisions of the Board is a limited one. We are confined to determinations of whether decisions are supported by substantial evidence on records considered as a whole. Universal Camera Corp. v. N. L. R. B., 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951). We believe the decision of the Board in this case is amply supported by substantial evidence, and we are unmoved by the contentions of Company and Knowles to the contrary.

The Company contends that the evidence clearly establishes that the discharge of the truck drivers was not motivated by hostility to the Union and to the men's efforts to organize, but rather that the termination of their employ-

7. Section 7 of the Act, 29 U.S.C.A. § 157, reads:

"Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collec-tive bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all of such activities except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a condition of employment as authorized in section 8(a) (3) of this Act."

ment resulted from a bona fide business decision on the part of the Company to turn over its trucking business to Knowles by leasing the trucking equipment to him. Ostensibly an economic motivation for getting out of the trucking business existed which arose from the marital difficulties of Bon Hennings and an unfavorable property settlement agreement. In support of this defense to the General Counsel's action the Company and Knowles supplied evidence tending to show that the leasing agreement had been contemplated sometime in September of 1959 and that the ultimate decision to enter into a leasing agreement was made on October 15th, a half month before the onslaught of union activity. Hennings' attorney testified that Hennings had asked him around the 25th or 26th of October to draw a lease to Knowles and that he had dictated one at that time, although he was unable to say when it was actually transcribed. Other evidence was offered in an effort to substantiate the independent business purpose of the lease which Company felt would raise a defense to the complaint of unfair labor practices.

The trial examiner, whose findings were adopted by the Board, in determining that the truck drivers were discharged for unlawful, anti-union motives, rejected Company's contention that the lease and the actions taken pursuant thereto were bona fide. The lease was held to be illusory and Knowles was considered to have remained the agent of Company. Most of the evidence was discredited, and of the attorney's testimony the examiner believed the attorney was mistaken as to his dates. The examiner pointed to various factors which strengthened his view of the case. For

example, the consummation of the lease immediately after the union activity of the drivers, the lack of notice to the drivers of their discharge, the absence of a satisfactory explanation as to just how the lease arrangement was going to help Hennings cope with his financial problems which purportedly arose from marital difficulties, and most crucial the terms of the lease (most of which have been recited above).

The Company and Knowles complain that in coming to its conclusions the Board as well as the trial examiner ignored uncontradicted and substantial evidence that the lease was made independent of union activity and that it alone supplied the reasons for discharge of the truck drivers rather than any anti-union motives. Such contentions assume of course that the evidence referred to is uncontradicted and substantial, but a review of the record in this case discloses much which fairly detracts from the weight and credibility of the Company's evidence. Some directly conflicts. Besides, the Supreme Court in a recent opinion [8] has laid to rest, quite properly, any contention that the uncontradicted evidence of an employer as to his motive for a certain course of action must be accepted by the Board.[9] No one but the employer or his confidants are ordinarily in a position to give direct evidence of his motive, and, to understate the case, it is unlikely that unfavorable evidence would be forthcoming. Much so-called "uncontradicted" evidence is subject to conflicting inferences which may result from the evidence itself or the attendant circumstances. The duty to choose between such inferences and to assess weight and credibility is vested in the trial examiner, not the reviewing court. We reiterate our

8. N. L. R. B. v. Walton Mfg. Co., 369 U.S. 404, 82 S.Ct. 853, 7 L.Ed.2d 829 (1962).

9. In Walton, supra, note 8, the Supreme Court reversed a decision of the Fifth Circuit wherein it appeared that the court might have applied a special rule which had been fashioned by the Fifth Circuit for use in reviewing reinstatement orders of the Board. The special rule in substance was that an employer's uncontradicted statement as to his motive had to be accepted by the Board unless he is impeached or substantially contradicted.

belief that under the circumstances present in this case the Board's findings are supported by substantial evidence on the record viewed as a whole; therefore, we agree with the conclusions of the Board that Company and Knowles were guilty of unfair labor practices which are proscribed by the Act.

### III. REINSTATEMENT AND BACK PAY

The trial examiner recommended and the Board ordered Company to offer certain drivers immediate and full reinstatement and to make said drivers whole for any loss of pay suffered by reason of Company's unfair labor practices. Back pay was to be based upon earnings which would have been made from the date of the discriminatory discharges to the date of the offers of reinstatement, less any net earnings during that period.

 The Board has power under the Act to order reinstatement with or without back pay,[10] and the Board exercising its discretion may fashion such orders in a manner which will effectuate the policies of the Act under the circumstances of each particular case.[11] The existence of unfair labor practices without more will justify orders of reinstatement with back pay. However, over the years an extensive array of cases have articulated principles which are used to determine if and to what extent reinstatement and/or back pay will be ordered.[12] Defenses do exist.

 It is well settled that an illegally discharged employee will lose his right to reinstatement if he has been unconditionally offered reemployment by the discharging employer and has refused such employment.[13] Much evidence was produced at the hearing before the trial examiner which was aimed at establishing that unconditional offers had been made. Some of the evidence is persua-

sive of the fact and much is uncontradicted. While the record clearly establishes that offers were made, the record does not so clearly establish that the offers were "unconditional" so as to raise a defensé to reinstatement. No doubt the evidence adduced is sufficient to support a finding of unconditional offers, but the record contains no findings by the Board or the trial examiner as to the unconditional nature of the offers. Under the trial examiner's view of the case, which view was shared by the Board, such findings were not considered necessary. The trial examiner put it this way:

"Considerable testimony was adduced relative to job offers made to some complainants by Respondent Knowles. I deem it unnecessary to pass on whether they were unqualified offers, because it is clear and I find that they were predicated upon the spurious lease to Knowles. Stated otherwise, I have found that Respondent Hennings Logging discriminatorily discharged complainants and Board policy requires that they receive an offer from that concern which is and was their employer. Entertainment or recognition of the offers from Knowles would be tantamount to a finding that the Hennings Logging lease to Knowles was bona fide and that is what is precisely contrary to the findings heretofore made."

The Board said substantially the same thing a little differently:

"The alleged offers by Knowles, although made at a time when Knowles was actually an agent of Respondent Employer, were not offers of reemployment with the Respondent Employer in connection with which any of their former rights would have been restored. These offers were therefore not of-

---

10. Section 10(c) of the Act, 29 U.S.C.A. § 160(c).

11. See Phelps-Dodge Corp. v. N. L. R. B., 313 U.S. 177, 61 S.Ct. 845, 85 L.Ed. 1271 (1941).

12. See generally Daykin, Back Pay Under the National Labor Relations Act, 39 Ia. L.Rev. 104 (1953).

13. Id. at 107-8.

fers of reinstatement and they did not affect the employees' rights to be reinstated by the Respondent Employer."

We agree with Company that the Board's position with regard to Knowles' offers of employment is logically untenable in light of the prior decision in connection with the charges of unfair labor practices that the lease between Company and Knowles was a sham and that Knowles was at all times the agent of Company. According to elementary principles of logic something which is black cannot at the same time be something that is not black. Mutual exclusives cannot co-exist. If the lease was sham and as a consequence Knowles was an agent of and under the control of Company he could not, insofar as offers of employment were concerned, be acting for himself and not for Company. The reasoning of the trial examiner that recognition of Knowles' offers as those of the Company would be tantamount to a recognition of the bona fides of the lease is incomprehensible. Quite the reverse would seem to be true. Thus, if the lease was a sham intended to disguise the unlawful nature of the discharges and Knowles was really the agent of Company a later determination that Knowles did not act for the Company would appear to be a recognition that the lease had substance and that Knowles was not an agent. Furthermore, we find nothing to support the Board's statement that the offers were not offers "in connection with which any of their former rights would have been restored."

■ We think that consistency requires that Knowles be considered to have been the agent of Company throughout. The Board under an erroneous view of Knowles' role in making offers failed to find whether the offers of employment were sufficiently unqualified so as to support a defense to reinstatement. If we thought the record permitted it we might determine whether the offers were unqualified, but we don't think the record is adequate and we will not do for the Board what should have been done in the first instance. It is the function of the Board to assess the weight and credibility of the evidence and to determine whether Knowles in his capacity as Company's agent made "unconditional" offers of employment, and on remand perhaps more evidence will be required to make such a determination.

■■ Back pay is often closely related to reinstatement but the remedies are not inextricably intertwined. One can exist without the other.[14] The Board in this case ordered back pay for the period between the unlawful discharges and the reinstatement offers as ordered made by the Board. Back pay is a remedy which has for one of its purposes the making of employees whole for losses in pay occasioned by unfair labor practices. Employees cannot be made more than whole.[15]

The Board's decision respecting back pay is confused and the confusion is not remedied by its brief in this court. After stating that a "clearly unjustifiable refusal to accept new employment" would provide ground for tolling or abatement of back pay the Board stated:

"Here, the offers were not offers made by a neutral employer. The offers were made by an agent of the culpable employer posing as a new employer. As noted, the offers were not offers of reinstatement. It would not effectuate the policies of the Act to require these employees to cooperate with their culpable employer by accepting from it, either directly or through its agent, less than the full reinstatement which is their due."

14. N. L. R. B. v. West Coast Casket Co., 205 F.2d 902, 908 (9th Cir. 1953).

15. See N. L. R. B. v. Seven-Up Bottling Co., 344 U.S. 344, 73 S.Ct. 287, 97 L.Ed. 377 (1953) and Phelps-Dodge Corp. v. N. L. R. B., 313 U.S. 177, 61 S.Ct. 845, 85 L.Ed. 1271 (1941).

The Board then concluded that the failure to accept Knowles' offers did not affect Company's responsibility for back pay. On brief the Board stated in support of its position:

"Courts have recognized that employees are not required to accept "discriminatory jobs" (N. L. R. B. v. Armour & Co., 154 F.2d 570, 571, 169 A.L.R. 421 (C.A.10) certiorari denied 329 U.S. 732, 67 S.Ct. 92, 91 L.Ed. 633) or offers which are a "negation" of their rights under the Act (N. L. R. B. v. Poultrymen's Service Corp., 138 F.2d 204, 211 (C. A.3))." [16]

The board while refusing to recognize Knowles as the agent of Company in connection with offers of employment did recognize Knowles as the agent of Company for purposes of back pay. However, the Board concluded that to require acceptance of Knowles' offers would force the drivers "to cooperate with their culpable employer." Cited in defense of this position are cases which have no proper application to the facts of this case, for in those cases the offers were for non-equivalent employment the acceptance of which would have deprived the employees of the very rights they alleged were violated by the employer.[17] We find no evidence to support the Board's statement that Knowles' offers were for "less than * * * full reinstatement." But we do not now decide that the offers were for full reinstatement to equivalent or better employment since the nature of the offers is a matter we leave to the Board upon further proceedings. We do, however, dispense with the Board's contention that the offers were necessarily for "discriminatory jobs" or that acceptance would have required the drivers to "cooperate with their culpable employer," simply because the offers were made by Knowles and not expressly in the name of the Company. Thus, the nature of the offers is an unresolved question, but, if it is determined that they were unqualified offers of full reinstatement, and were not subject to any condition which restricted the right of the drivers under Section 7 of the Act, the failure of the drivers to accept such offers would affect Company's back pay obligations. The offers would toll the running of the back pay obligation from the time they were made, though it is possible that the obligation would survive for the interim period be-

16. See note 17 infra.

17. In N. L. R. B. v. Armour & Co., 154 F.2d 570 (10th Cir. 1946), a group of clerical employees had attended a union meeting for purposes of organization. The employer considered these employees to be part of management, not production employees, who would not be entitled to belong to labor organizations. The employees were told that each must make a choice between his present job without union membership and a different (less desirable) job where unions would be permitted. Several employees had decided to keep their old jobs rather than join the union, but they later attended another union meeting. The employer offered to transfer them to less desirable and less remunerative jobs, but this offer was rejected. The employees were discharged. The Board found that the discharges constituted unfair labor practices and ordered reinstatement with back pay. The employer contended that the back pay award should be decreased by the amount which would have been made if the offers of lesser employment would have been accepted. The court held that acceptance of the lesser jobs was not required. The employees would have had to submit to discrimination in order to belong to a union, and union membership under the Act is guaranteed without accepting discrimination.

In N. L. R. B. v. Poultrymen's Service Corp., 138 F.2d 204 (3d Cir. 1943), a group of employees had been on strike for an extended period following their employer's refusal to bargain and recognize their union. All negotiations failing and the strikers in financial difficulty, a group of the employees signed a contract with the employer which by its terms was a complete surrender by the employees of their rights as guaranteed by the Act. Offers of employment based upon this contract were not defenses to back pay because the offers were not for full and fair employment. Requiring acceptance would require the employees to adhere to an inherently discriminatory contract which denied them rights to which they were entitled.

tween the unlawful discharges and the offers.

The evidence discloses that the discharged truck drivers almost from the beginning took part in a strike against the Company. Company contends that striking employees are not entitled to back pay whether the strike be an economic strike or an unfair labor practice strike. While it is clear that there is no back pay obligation in connection with an economic strike,[18] we do not believe that participation in an unfair labor practice strike necessarily defeats a right to back pay. N. L. R. B. v. Cowell Portland Cement Co., 148 F.2d 237, 245 (9th Cir.1945). Company has not cited us to any authority to the contrary. The remedies of the Board to cure violations of public policy cannot be removed by the exercise by employees of their right to protest unlawful employer action. This strike could not be an economic strike (although the line may often be hard to draw) for no increased benefits of any kind had ever been discussed or subjected to negotiation. The strike was not motivated directly by economic considerations. Of course, participation in an unfair labor practice strike can affect the amount of back pay recoverable insofar as the strike hampered the efforts of discharged employees to mitigate their damages by seeking new employment. The Board recognized the effect of the strike in this last mentioned regard and stated in its decision that Company during the compliance period "will be afforded an opportunity to adduce evidence concerning efforts, or lack of efforts, of the discriminatees to seek suitable new employment." We assume the Board will adhere to its statement.

On remand we contemplate that the Board will determine the exact nature of the offers that were made (whether unconditional, equivalent, etc.) at all times considering Knowles to be Company's agent. The effect of the offers on reinstatement and back pay is to be decided free of any notions that Knowles was acting for himself or that the offers (if for substantially equivalent employment (duties, conditions, pay etc.)) would be for "discriminatory jobs." We also contemplate that all issues will be determined regarding the remedy, if any, which is proposed including a consideration of the employees' duty to mitigate damages and the actual amounts, if any, which are assessed. In this manner further petitions for review or enforcement, if any, will more than likely be dispositive of the case.

The Board's findings of unfair labor practices are affirmed; and therefore the petitions of the Board for enforcement of its cease and desist orders are granted. The order insofar as reinstatement and back pay are concerned is vacated and the cause is remanded to the Board for further proceedings, including the taking of further evidence if necessary, not inconsistent with the foregoing opinion.

18. See Daykin, op. cit. supra note 12, at 110.