EMPIRE STATE SUGAR COMPANY, Inc., Petitioner,

American Federation of Grain Millers, AFL–CIO, and its Local 332, Intervenor,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent.

No. 469, Docket 31732.

United States Court of Appeals Second Circuit.

Argued May 6, 1968.

Decided Sept. 23, 1968.

Jesse Freidin, New York City (Herbert Prashker, Frank Cummings, and Poletti, Freidin, Prashker, Feldman & Gartner, New York City, on the brief), for petitioner.

Thomas P. McMahon, of McMahon & Crotty, Buffalo, N.Y., for intervenor.

Glen M. Bendixsen, Atty., N.L.R.B. (Arnold Ordman, General Counsel, Dominick L. Manoli, Associate General Counsel, Marcel Mallet-Prevost, Asst. General Counsel, and Robert E. Williams, Atty., N.L.R.B., on the brief), for respondent.

Before LUMBARD, Chief Judge, and SMITH and ANDERSON, Circuit Judges.

J. JOSEPH SMITH, Circuit Judge:

This is a petition to review a final order of the National Labor Relations Board, 166 NLRB No. 22, and a cross motion by the Board to enforce. The order was issued upon a finding by the Board that the Empire State Sugar Company (herein the Company) had violated section 8(a) (1) and (2) of the National Labor Relations Act, as amended. (61 Stat. 136, 73 Stat. 519, 29 U.S.C. § 151 et seq.)[1] The Board ordered the Company to cease and desist from giving effect to a collective bargaining agreement between it and the American Federation of Grain Millers, Local 332 (herein the

---

1. The relevant provisions of the Act are as follows:

#### RIGHTS OF EMPLOYEES

Sec. 7. Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all of such activities except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a condition of employment as authorized in section 8(a) (3).

#### UNFAIR LABOR PRACTICES

Sec. 8(a) It shall be an unfair labor practice for an employer—

(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 7;

\*   \*   \*   \*   \*

(2) to dominate or interfere with the formation or administration of any labor organization or contribute financial or other support to it: *Provided*, That subject to rules and regulations made and published by the Board pursuant to section 6, an employer shall not be prohibited from permitting employees to confer with him during working hours without loss of time or pay;

\*   \*   \*   \*   \*

(b) It shall be an unfair labor practice for a labor organization or its agents—

\*   \*   \*   \*   \*

(7) to picket or cause to be picketed, or threaten to picket or cause to be picketed, any employer where an object thereof is forcing or requiring an employer to recognize or bargain with a labor organization as the representative of his employees, or forcing or requiring the employees of an employer to accept or select such labor organization as their collective bargaining representative, unless such labor organization is currently certified as the representative of such employees: (A) where the employer has lawfully recognized in accordance with this Act any other labor organization and a question concerning representation may not appropriately be raised under section 9(c) of this Act, (B) where within the preceding twelve months a valid election under section 9(c) of this Act has been conducted, or (C) where such picketing has been conducted without a petition under section 9(c) being filed within a reasonable period of time not to exceed thirty days from the commencement of such picketing: *Provided*, That when such a petition has been filed the Board shall forthwith, without regard to the provisions of section 9(c) (1) or the absence of a showing of a substantial interest on the part of the labor organization, direct an election in such units as the Board finds to be appropriate and shall certify the results thereof: *Provided further*, That nothing in this subparagraph (C) shall be construed to prohibit any picketing or other publicity for the purpose of truthfully advising the public (including consumers) that an employer does not employ members of, or have a contract with, a labor organization, unless an effect of such picketing is to induce any individual employed by any other person in the course of his employment, not to pick up, deliver or transport any goods or not to perform any services. Nothing in this paragraph (7) shall be construed to permit any act which would otherwise be an unfair labor practice under this section 8(b).

\*   \*   \*   \*   \*

Millers) insofar as it embraces the Company's powerhouse employees, and from recognizing the Millers as exclusive bargaining agent for those employees without Board certification. We deny the petition for review, and enforce the order.

In September 1965 the Company opened a new sugar refining plant in Montezuma, New York. Union organizational activity began shortly thereafter. Afterward, election petitions were filed, covering all the employees in the plant, by the Millers and the Teamsters. The International Union of Operating Engineers, Local 71–71A (herein the Engineers), sought to represent only those employees working in the powerhouse. No union received a majority of either bargaining unit in the election held on November 16, 1965. A new election could not be held for at least a year under § 9(c) (3) of the Act.[2]

Organizational activity began again early in 1966. On April 26, the Engineers sent a letter to the Company claiming a majority of the powerhouse employees, offering to submit authorization cards as proof, and requesting recognition. The Engineers had at the time signed cards from five of the six powerhouse employees. On May 3 the Company replied that it doubted the Engineers' majority and felt that the question could best be resolved by the Board. About a week later, a similar request by the Millers made with respect to a plant-wide unit met with a similar refusal. After a strike threat, the Company agreed with the Millers to an impartial card count. The impartial party, Father Shamon, on checking the Millers' cards against the payroll list, found that all the powerhouse employees had signed authorization cards designating the

Millers; the same was true for a majority of the other employees. No check was requested by the Company or made of the Engineers' cards. Recognition of, negotiation with, and a contract with the Millers covering all of Empire's employees soon followed.

On July 7, after learning that Empire had recognized the Millers, the Engineers filed 8(a) (1), (2) and (5) charges based upon alleged unlawful refusal to bargain with the Engineers following the April 26 recognition demand, and unlawful recognition of the Millers. On July 26 the Engineers dropped the 8(a) (2) charge. On October 3 a second amendment dropped the 8(a) (5) charge and reinstated the 8(a) (2) charge. The same day the Regional Director issued a complaint, charging Empire with unlawful aid and assistance to the Grain Millers in violation of 8(a) (1) and 8(a) (2) of the Act.

The trial examiner found that the Company violated Sec. 8(a) (1) and (2) of the Act by recognizing and entering into the union security contract with the Millers covering a unit which included the powerhouse employees, and recommended an order that the Company desist from enforcing the contract in its coverage of those employees and withdraw recognition of the Millers as bargaining representatives of the powerhouse employees unless and until certified by the Board. The Board adopted the findings and in substance the recommended order.

The principal findings under attack are: (1) that the powerhouse employees were an appropriate separate bargaining unit, and (2) that the Company was faced with a real question concerning representation when it recognized one of two or more rival unions. Central to

2. (3) No election shall be directed in any bargaining unit or any subdivision within which in the preceding twelve-month period, a valid election shall have been held. Employees engaged in an economic strike who are not entitled to reinstatement shall be eligible to vote under such regulations as the Board shall find are consistent with the purposes and provisions of this Act in any election conducted within twelve months after the commencement of the strike. In any election where none of the choices on the ballot receives a majority, a run-off shall be conducted, the ballot providing for a selection between the two choices receiving the largest and second largest number of valid votes cast in the election.

the problem on all issues is the fact that the Company's actions took place during the one-year period following the no-union election result, during which period due to Sec. 9(c) (3) the election procedure was unavailable for the resolution of representation disputes.

■ (1) The finding that the powerhouse employees are an appropriate separate bargaining unit is supported by substantial evidence on the record as a whole and must be upheld. The powerhouse employees are physically isolated to some extent from the rest of the plant. The powerhouse is treated as a separate department. Its employees are required to be experienced in operation and maintenance of high pressure boilers and turbogenerating equipment, and receive the highest wage rate of plant employees. This is not to say that they have nothing in common with the other employees, for in the off seasons they may be utilized on other maintenance work in the plant, and the entire plant operation is to a large degree integrated. Thus a contrary determination might have been sustainable. But the Board has very wide discretion under Sec. 9(b) in regard to unit determination, and we will not reverse its finding in the absence of an "arbitrary or capricious exercise of administrative discretion," not present here. NLRB v. National Broadcasting Co., 150 F.2d 895, 898 (2 Cir. 1945).

■ (2) The Board's condemnation of the Company's recognition of and contract with the Millers is based on a finding that the Company's action came at a time when there was a real question of representation of the powerhouse employees based on the conflicting claims of the Millers and the Engineers. This, the Board held, was contrary to the rule of Midwest Piping and Supply Co., 63 NLRB 1060, recognized by this and other courts (see NLRB v. National Container Corp., 211 F.2d 525, 536 (2 Cir. 1954)) requiring that a union's right to be recognized first be determined under the election procedures provided in the Act rather than by an employer's wrongfully usurping the employees' right of choice under the Act.

The underlying finding that there was a real question of representation is clearly supported by substantial evidence in the record, and must stand. Universal Camera Corp. v. NLRB, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951). The Company knew that there had been organizing efforts by the Engineers, and had been informed that five of the six powerhouse employees had signed Engineers' cards by April 24, 1966. The Company did not place its refusal to recognize the Engineers on lack of a majority of the powerhouse employees, but on lack of reliable proof through a Board election, which was at the time unavailable. It did not call for a card check to test the accuracy of the Engineers' claim, but less than a month later signed with the Millers on a card check by an impartial person, to whom, however, the Engineers' cards were not submitted.

■■ Ordinarily this finding that a real question as to recognition existed would conclude the Company under the Midwest Piping doctrine. The Company contends, however, that the doctrine cannot be applied here, since a Board election was barred at the time by Sec. 9(c) (3). But the difficulty raised by this circumstance cannot support the Company's course of action here. The purpose of the election procedure is to obtain a free employee choice without the intervention of the employer in the selection of the representative of the employees. Temporary unavailability of the election procedure should not allow such employer intervention when other alternatives are available more consistent with the spirit of the Act. Here the Company might have authorized the neutral third party, Father Shamon, to conduct an informal poll of the powerhouse employees to determine the extent of their support of the Millers. See NLRB v. Yokell, 387 F.2d 751, 755 (2 Cir. 1967). Affidavits procured from the employees might have eliminated the ambiguity of the duplicate cards, NLRB

v. Standard Steel Spring Co., 180 F.2d 942 (6 Cir. 1950). The Company could have recognized the Millers as the representative of the production and maintenance employees and declined so to recognize the Millers as to the powerhouse employees until the one-year waiting period was up, or until the Board should investigate a petition under 9(c)(1) of the Act and certify that no representation question was found to exist.

The Act might well be made more specific as to the courses open to the parties during the one-year period, but the lack of more specific guides cannot justify employer intervention in a genuine representation dispute, such as occurred here.

Since the statutory period has now run, it is open to the Board to conduct an election of a representative of the powerhouse employees under Sec. 9(c) upon a proper petition as soon as it deems appropriate. Apparently the Board contemplated such a course of action in its modification of the Examiner's recommended order.

The petition for review is denied. Judgment may enter enforcing the Board's order.