**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**GEORGE J. ROBERTS & SONS, INC., d/b/a The Roberts Press, Respondent.**

**No. 135, Docket 71-1477.**

United States Court of Appeals, Second Circuit.

Argued Oct. 18, 1971.

Decided Nov. 16, 1971.

---

Steven C. Kahn, Atty., Eugene G. Goslee, Acting Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Elliot Moore, Atty., N.L.R.B., Washington, D.C., for petitioner.

David D. Wach, Rockville Centre, N. Y. (Siben & Siben, Bay Shore, N. Y., for respondent.

Before MEDINA, MANSFIELD and MULLIGAN, Circuit Judges.

MULLIGAN, Circuit Judge:

This case is before this court upon the application of the National Labor Relations Board pursuant to Section 10(e), of the National Labor Relations Act (29 U.S.C. § 160(e)), for enforcement of its order issued against George J. Roberts & Sons, Inc., d/b/a The Roberts Press, on February 9, 1971 and reported at 188 N.L.R.B. No. 51.

The respondent is engaged in the publication and distribution of a classified directory called the "Handy Guide" in twenty trading areas in Nassau and Suffolk Counties on Long Island. The "Handy Guide" contains a listing of names, addresses and telephone numbers of individuals and business establishments. The publication is distributed without charge to residents of these areas, and revenue is substantially derived from the sale of commercial advertising. Respondent also publishes an Atlas, which is a supplement to the

Guide; it lists by street address rather than by name. It is distributed at no cost and is financed by rentals to certain organizations. The respondent, which has its sole place of business in Patchogue, L.I., is essentially family operated: George J. Roberts, Sr. is president and owner; George Roberts, Jr. is vice president and plant manager; George Roberts, IV is in charge of the bindery. The company employs about 48 people exclusive of supervisory personnel. In the calendar year 1968 gross income was $525,000.

I

 The threshold issue raised by respondent is the jurisdiction of the National Labor Relations Board. The respondent's business is local in the sense that its advertisers and subscribers are all located in Nassau and Suffolk Counties and its publications are not distributed elsewhere. While respondent's business itself may be intrastate, § 10 (a) of the Act (29 U.S.C. § 160(a)) empowers the Board to assume jurisdiction over any person who engages in an unfair labor practice "affecting commerce". It is further noted that the Supreme Court "has consistently declared that in passing the National Labor Relations Act, Congress intended to and did vest in the Board the fullest *jurisdictional* breadth constitutionally permissible under the Commerce Clause." NLRB v. Reliance Fuel Oil Corp., 371 U.S. 224, 226, 83 S.Ct. 312, 313, 9 L.Ed.2d 279 (1963) (emphasis in original). See United States v. Ricciardi, 357 F.2d 91, 96 (2d Cir.), cert. denied, 384 U.S. 942, 86 S.Ct. 1464, 16 L.Ed.2d 540 (1966); A. Cox & D. Bok, Cases and Materials on Labor Law 116 (7th ed. 1969). The Board has, for practical purposes, restricted its jurisdiction, in the case of nonretail establishments, to those enterprises which have an interstate inflow of materials in excess of $50,000 annually. Siemons Mailing Service, 122 N.L.R.B. 81, 85 (1958). Since in 1968 the respondent imported from outside the State of New York $51,941 in merchandise, primarily paper from one supplier in Maine, the Board has properly assumed jurisdiction. Respondent's contention that the Board should have used the 12 month period immediately preceding the issuance of the complaint, i. e., September 1, 1968 to August 31, 1969, during which period purchases originating outside New York were $13,000 less than that for the calendar year 1968, is unsupported and contrary to the usual practice of the Board. See Jos. McSweeney & Sons, Inc., 119 N.L.R.B. 1399, 1401 (1958); F. M. Reeves & Sons, Inc., 112 N.L.R.B. 295, 295–96 n.1 (1955), enforced, 273 F.2d 710, 712 (10th Cir. 1959). The argument that respondent is publishing a newspaper and therefore escapes jurisdiction since it has no national syndication or national advertising is strained and is not supported by authority.

II

The Board found that the respondent violated sections 8(a) (1) and 8(a) (3) of the National Labor Relations Act (29 U.S.C. § 158(a) (1) and § 158(a) (3)) by coercively interrogating and threatening employees with respect to their union activities and by discharging and refusing to recall employees because of union activities. The underlying facts in support of such findings are as follows:

In April 1969, Herbert Moller, a compositor employed by respondent, contacted Jack Douglas, President of the Long Island Typographical Union No. 915, International Union, for the purpose of establishing an organization of respondent's composing room employees. Moller was provided with authorization cards, which were distributed to the employees in May; twelve were signed and returned to Douglas. On June 10, 1969 Douglas and Joseph Gagnon, a union vice president, visited the respondent's plant and presented Roberts with a letter advising that a substantial majority of the employees, who performed composing room operations, had authorized the union to represent them for the purpose of collective bargaining in all matters con-

cerning wages, hours and working conditions. Roberts expressed shock, said he was not interested in the union and doubted that it had jurisdiction in Suffolk County. He was given and examined the authorization cards. He wanted a month to think the matter over but finally agreed to get in touch with them in two weeks. Roberts, who was obviously angry, visited the composing area later that afternoon and questioned employees Stekardis, Sinert and Moller as to whether they had signed cards. It is clear from the record that he expressed his disappointment at their desire to join a union and that he said if it were not for Moller's eye glasses he would punch him in the nose. He reminded employees Sinert and Bonanno of his past employment of members of their families. Later that same afternoon the foreman, Gallo, who had been with Roberts when he talked to the employees, personally advised Moller that, although he was a capable employee and Roberts would recommend him to other employers, he was discharged because he was disgruntled and discontented and Roberts did not feel safe with him in the plant. At the Board hearing, Roberts denied that Moller's union activity had motivated the firing.

On June 13, Roberts delivered a speech to an assembly of all 48 employees in which he reported that since October, 1968, he had been discussing with Videographic Systems, Inc. the prospect of computerizing the composing room operation. He explained that he had twice rejected offers made because of his concern for the employees who would be affected. He then recounted the visit of the union officials and read the letter they had delivered to him. He stated that his father had been a member of the union and that he had no bias against unionism. Roberts stated that reluctantly he had decided to purchase composition from outside sources, and then announced the closing of the composing room department. Its employees

were terminated on June 19th. A picket line was established on June 20th.

### III

■ We hold that the firing of Moller on June 10th violated Section 8(a)(3) of the Act as found by the Board. Respondent urges that Moller's firing was due to his insubordination, which he manifested by "smirking" at Roberts when he visited the composing room that afternoon and questioned the employees. He also removed his glasses when Roberts, aged 73, threatened to punch him, but this was hardly a display of truculence on the part of Moller. There is also a claim that Moller was disruptive in that he was obsessed with the necessity of being first in line checking out of the plant each night resulting in numerous altercations with other employees. This is a stale and flimsy pretext. The overriding consideration here is that Moller, concededly a capable employee with eight years experience, was summarily fired on the very day that the union officials, whom he had contacted, visited Roberts. His discharge was unquestionably due to his effort to bring in the union and is therefore violative of the Act. See NLRB v. Dorn's Transportation Co., 405 F.2d 706. 712–713 (2d Cir. 1969). Even if there were ample grounds to fire Moller, and none exist here, if his discharge was even partially motivated by his union activity, there is a violation of § 8(a)(3). NLRB v. Gladding Keystone Corp., 435 F.2d 129, 131–132 (2d Cir. 1970); NLRB v. Pembeck Oil Corp., 404 F.2d 105, 109 (2d Cir. 1968), vacated and remanded on other grounds, 395 U.S. 828, 89 S.Ct. 2125, 23 L.Ed.2d 737 (1969); NLRB v. Milco, Inc., 388 F.2d 133, 138 (2d Cir. 1968).

### IV

■ We also hold that the discharge of the eleven composing room employees (Scott, Stekardis, Bonanno, Fawcett, J. Vedder, Otto, Rostocki, Lef-

fert, Harris, R. Vedder, Sinert) violated Section 8(a) (3) of the Act as found by the Board.* This is, in our view, a closer question than the firing of Moller, since an employer has the right to discontinue the operation of a department for financial rather than anti-union reasons. NLRB v. R. C. Mahon Co., 269 F. 2d 44, 47 (6th Cir. 1959); see NLRB v. Dorn's Transportation Co., 405 F.2d 706, at 712, 2 Cir.; NLRB v. Gopher Aviation, Inc., 402 F.2d 176, 183 (8th Cir. 1968). It is undisputed that prior to this layoff the respondent had been negotiating with Videograph regarding the computerization of its composition work. The question is whether the motive of respondent was financial or simply a desire to avoid unionization. NLRB v. Goya Foods, Inc., 303 F.2d 442 (2d Cir.), cert. denied, 371 U.S. 911, 83 S.Ct. 256, 9 L.Ed.2d 171 (1962); Bon Hennings Logging Co. v. NLRB, 308 F.2d 548, 554 (9th Cir. 1962); NLRB v. Brown-Dunkin Co., 287 F.2d 17, 19 (10th Cir. 1961).

■ The role of the Court of Appeals in reviewing decisions of the Board is to determine whether "on the record as a whole there is substantial evidence to support agency findings." Universal Camera Corp. v. NLRB, 340 U.S. 474, 491, 71 S.Ct. 456, 466, 95 L.Ed. 456 (1951). There is substantial evidence here on the whole record to establish that respondent's discontinuance of the composition department was motivated by hostility to the union. Although there had been prior dealings with Videograph, respondent had turned down its propositions before unionization became a prospect and accepted them on June 12, two days after being apprised of the signing of the authorization cards by the very people fired on June 19th. The proposal accepted by respondent on June 12th was substantially the same as that submitted by Videograph on May 22nd and rejected by respondent on May 31st because it was too expensive. Respondent urges that the anticipation of increased labor costs due to unionization is a realistic factor which permits the employer to discontinue the operation affected, placing major reliance on NLRB v. R. C. Mahon, 269 F.2d 44 (6th Cir. 1959). We cannot agree with respondent's contention that the circumstances there are identical to those presented here. In that case, the plant was already unionized, and the cost difference in continuing the existing guard service employees and employing an independent contractor was demonstrable. In our case no such cost saving has been established. In *R. C. Mahon* the company was in bad financial condition; it had made efforts for two years to curtail expenses, and its two major executives had been critically ill during this period. No such factors appear here. Most importantly, the court in *R. C. Mahon* found that the employer had a "complete lack of hostility toward the union", NLRB v. R. C. Mahon, 269 F.2d at 47. In our case respondent's hostility is demonstrated by the reaction of Roberts on June 10th and the speech of June 13th which was delivered not only to those who were about to be terminated but to all 48 employees. The reading of the letter from the union to the assembled workers in this context certainly indicated the respondent's attitude. After the picket line had been established, Videograph refused to go forward. Respondent, faced with the problem of producing the "Handy Guide", instead of rehiring its employees, retained Gallo, the erstwhile foreman, ostensibly as an independent contractor, to continue the work of composition. Gallo hired five people who performed the same composing room functions on the same machines and with the same materials as were

---

* The facts also support the Board's finding that Roberts' interrogation of his employees on June 10th, and his speech on June 13th constituted a violation of Section 8(a) (1) of the Act. The statements were threatening in themselves, and were made in the context of his discharge of the employees involved. See NLRB v. Rubin, 424 F.2d 748, 751 (2d Cir. 1970); NLRB v. L. E. Farrell Co., 360 F.2d 205, 207 (2d Cir. 1966).

previously performed for the company by the discharged employees. The machines and materials continued to be owned by the company and remained at all times in its plant. As of the time of the hearing, Gallo had performed work only for the company, maintained a desk in the company's plant, utilized the company's telephone, and continued to be covered under the company's Blue Cross program. The record establishes convincingly that this was a mere device to avoid negotiation with the union. See NLRB v. Goya Foods, Inc., *supra;* Bon Hennings Logging Co. v. NLRB, 308 F. 2d 548 at 553–554, 9 Cir. In short, we find that there is substantial evidence in the record as a whole to support the Board's finding that the respondent's motivation in the firing of the eleven compositor employees was anti-union bias, and thus constituted an 8(a) (3) violation.

## V

■ The Board has further found that the refusal to recall two employees, Fawcett and Tusso, was also violative of section 8(a) (3) of the Act. We do not find substantial evidence on the record to support this and decline to enforce in these two cases.

Andrew Fawcett, Jr., was the son of Mrs. Evelyn Fawcett, a proofreader of the respondent, who was improperly discharged on June 19th. Fawcett was a student who was only employed during vacation periods as a deliverer of the "Handy Guide." The theory of the Board is that he was not hired in August, when delivery personnel were needed, because he was sympathetic to the plight of his mother, who was on the picket line. While we have no doubt of Fawcett's affection for his mother, we find no substantial evidence in the record to establish that respondent's disaffection for his mother, caused it to fail to rehire the son. Neither did the Trial Examiner, who in this case found no unfair labor practice. Fawcett was discharged in June when the composing room personnel were discharged, but there were no books to be delivered then, and all other deliverers were terminated at about the same time. Fawcett refused to cross the picket line to pick up his June check, and there would be no reason at all to believe that he would, at anytime, cross it to go to work. In fact, he was shortly thereafter hired elsewhere and never sought to return to work. There is no evidence to establish any reprisal here or anti-union animus on the part of the respondent.

Mrs. Tusso was also employed on a part-time basis to deliver "Handy Guides" and was, in fact, never discharged by the respondent. The testimony is undisputed that she was injured while working and stayed at home receiving Workmen's Compensation benefits. The theory of the Board here is that although she, like Fawcett, was not a member of the union, she was not recalled for deliveries in August because she was friendly with Rosemary Bonanno, a discharged employee, and therefore was another victim of reprisal. While it is true that Roberts did question her about this, the good will of the respondent is evidenced by the letter given to her by Roberts on July 21. Mrs. Tusso was seeking to raise mortgage money from a bank, and Roberts provided her with a letter of recommendation which not only characterized her work as satisfactory in every respect but stated that the possibility of her continued employment was very good and that she could remain employed as long as she cared to. Roberts testified that at his interview with her, she was told to get in touch with the foreman when the books were available. In fact, Roberts, Jr., wrote a second reference letter on her behalf on August 15th repeating that her prospects for continued future employment were good. It is again undisputed that Mrs. Tusso, like Fawcett, never contacted the respondent to seek employment. There is no substantial evidence here of bias against Tusso. While it is clear that both Fawcett and Mrs. Tusso were sympathetic with the discharged employees, we think that it was this sym-

pathy which precluded them from crossing the line and not any animus on the part of respondent which prevented their re-employment.

## VI

■ Finally, there is substantial evidence on the record as a whole to support the Board's finding that respondent violated section 8(a) (5) of the Act, by refusing on and after June 10th, to recognize and bargain with the union. Respondent contends that the 12 composing room employees who signed authorization cards did not constitute an appropriate bargaining unit, and therefore he acted in "good faith" in refusing to bargain with them.

The Board determined that the appropriate bargaining unit consisted of 13 employees who comprised a distinct identifiable group. Respondent contends that this unit is inappropriate in that it includes three employees denominated by respondent as "office" workers, two employees denominated as "trainees", and a sixth employee who was an artist-cameraman. However, a Board unit determination is largely a matter of informed discretion not to be lightly set aside. Wheeler-Van Label Co. v. NLRB, 408 F. 2d 613, 617 (2d Cir.)., cert. denied, 396 U.S. 834, 90 S.Ct. 90, 24 L.Ed.2d 84 (1969); Empire State Sugar Co. v. NLRB, 401 F.2d 559, 562 (2d Cir. 1968). The Board found that the above employees performed primarily composition duties and its finding that the 13 employees are an appropriate bargaining unit is supported by substantial evidence on the record as a whole and must be upheld. While this subsequent determination by the Board does not negate respondent's claim of "good faith", the assertion cannot stand in face of its commission of the unfair labor practices discussed *supra*. For even though commission of an unfair labor practice is not per se evidence of "bad faith", NLRB v. United Mineral & Chemical Corp., 391 F.2d 829, 837–838 (2d Cir. 1968), respondent's discharging of all of the employees who had signed union authoriza-

tion cards demonstrates that it "would not have recognized the union no matter what the facts turned out to be." *Id.* at 838. Even if those employees challenged by Roberts were excluded from the composing room unit, the fact remains that a majority of the remaining composing room employees signed authorization cards.

Under such circumstances, the issuance by the Board of a bargaining order was proper. The Board made the requisite finding under NLRB v. Gissel Packing Co., Inc., 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969) that a fair election was not possible in view of the widespread unfair labor practices committed by respondent. Respondent has advanced no cogent reason why that finding should not stand. See NLRB v. V & H Industries, Inc., 433 F.2d 9 (2d Cir. 1970).

Order enforced except with respect to employees Andrew Fawcett and Tusso for whom enforcement is denied.

